# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARIUS BUTLER,<br><br>                     Petitioner,<br><br>v.<br><br>W. L. MONTGOMERY, et al.,<br><br>                   Respondents. | Case No.:  16cv39-GPC-MDD<br><br>**REPORT AND RECOMMENDATION RE DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS** |

Petitioner Darius Butler, a state prisoner proceeding pro se and in forma pauperis, has filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  (ECF No. 1.)  He challenges his San Diego Superior Court convictions for attempted murder, kidnapping, forcible sodomy and forcible oral copulation, for which he was sentenced to 50 years-to-life plus 19 years in state prison.  (Pet. at 1-2, 15.)  He claims that his federal constitutional rights were violated by the failure of the trial court to sua sponte instruct the jury on attempted voluntary manslaughter as a lesser included offense of attempted murder (Claim 1), on his reasonable but mistaken belief the victim consented (Claim 2), and on the defense of accident (Claim 3).  (Id. at 17-31.)  He also claims the trial court failed to adequately investigate potential juror misconduct (Claim 4), and that he received ineffective assistance of counsel due to his trial counsel's failure to object to comments made by the prosecutor during closing argument (Claim 5).  (Id. at 32-46.)

1

Respondent has filed an Answer and lodged the state court record. (ECF Nos. 12-13.) Respondent argues that habeas relief is unavailable because: (a) Claims 1 and 2 do not present a federal question, but even if they do the adjudication of those claims by the state court is objectively reasonable; (b) Claim 3 is unexhausted, procedurally defaulted and does not present a federal question, but can be denied irrespective of the failure to exhaust because it is without merit; and (c) the state court denial of Claims 4 and 5 is objectively reasonable. (Answer at 22-61.)

Petitioner has filed a Traverse. (ECF No. 20.) He admits Claim 3 is unexhausted and procedurally defaulted, and requests it be withdrawn from his Petition, but argues that his remaining claims have merit. (Traverse at 2, 13-37.)

For the following reasons, the Court finds that Petitioner has exhausted his state court remedies with respect to Claim 3, that it is not procedurally defaulted, and that all of Petitioner's claims were adjudicated on their merits in the state court. The Court finds that the adjudication by the state court is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court. Finally, the Court finds that even if Petitioner could satisfy that standard and show that an error occurred which rose to the level of a federal Constitutional violation, any such errors are harmless. The Court therefore recommends the Petition be denied.

## I.     PROCEDURAL BACKGROUND

On March 26, 2012, the San Diego County District Attorney's Office filed a third amended felony complaint charging Petitioner with kidnapping for the purpose of committing sodomy and/or oral copulation in violation of Penal Code section 209(b)(1) (count 1), forcible oral copulation in violation of Penal Code section 288(c)(2)(A) (count 2), forcible sodomy in violation of Penal Code section 288(c)(2)(A) (count 3), and attempted murder in violation of Penal Code section 187(a) (count 4). (Lodgment No. 2, Clerk's Tr. ["CT"] at 21-25.) As to all counts the complaint alleged that Petitioner used a deadly weapon (a knife) and committed the offenses while he was released on bail. (Id.)

As to counts 2-4 the complaint alleged he personally inflicted great bodily injury on the victim, and as to counts 2 and 3 it alleged he substantially increased the risk of harm by kidnapping the victim.  (Id.)

Following a jury trial, Petitioner was found guilty on all counts.  (CT 371-80.)  The jury found true the allegations that he was released on bail at the time of the offenses, that he substantially increased the risk of harm to the victim by kidnapping her with respect to counts 2 and 3, that he personally inflicted great bodily injury during the commission of counts 3 and 4, and that he personally used a deadly weapon during the commission of count 4.  (Id.)  The jury returned not true findings that he used a deadly weapon during the commission of counts 1-3 and inflicted great bodily injury during the commission of count 2.  (Id.)  A new trial motion argued, inter alia, that the investigation into juror misconduct was inadequate.  (CT 184-208.)  That motion was denied and Petitioner was sentenced to 50 years-to-life plus 19 years in state prison.  (CT 383-85.)

Petitioner appealed, raising Claims 1-4 presented here.  (Lodgment Nos. 3-6.)  While the appeal was pending in the appellate court, Petitioner's appellate counsel withdrew Claim 3 on the basis that the claim "has been resolved by the California Supreme Court and there is no longer a *sua sponte* duty for the court to instruct on the defense of accident." (Lodgment No. 4.)  The state appellate court affirmed the convictions in a written opinion. (Lodgment No. 7, People v. Butler, No. D063890 (Cal.Sup.Ct. July 22, 2014).)  Petitioner then filed a petition for review in the California Supreme Court presenting Claims 1-4 raised here.  (Lodgment No. 8.)  Petitioner included the previously withdrawn Claim 3 and requested a remand for the appellate court to consider the claim.  (Id. at 26.)  On October 16, 2014, the California Supreme Court summarily denied the petition for review in an order which stated: "The petition for review is denied."  (Lodgment No. 9.)

Petitioner thereafter filed habeas petitions in the state superior, appellate and supreme courts raising Claim 5.  (Lodgment Nos. 10, 12, 14-15.)  The claim was denied on the merits by the superior and appellate courts, and summarily denied without citation of authority by the state supreme court.  (Lodgment Nos. 11, 13, 16.)

16cv39-GPC-MDD

## II.    FACTUAL BACKGROUND

The following facts are taken from the California Court of Appeal opinion affirming Petitioner's convictions on direct appeal.  This Court gives deference to state court findings of fact and presumes them to be correct.  <u>Sumner v. Mata</u>, 449 U.S. 539, 545-47 (1981).

In 2010, Butler was in his early 20's and a tall, strong ex-Marine when he met 20-year-old Danielle (5'3" tall).  They had a harmonious romantic and sexual relationship for about four months.  He gave her a knife and taught her how to use it.  They started to argue and physically fight about their relationship and mutual infidelity and periodically broke up, but they continued their sexual relationship off and on for about a year.

These charges arose out of an October 2011 incident involving Danielle's overnight visit to his apartment, involving drinking and consensual sex, and then the next day of being together drinking, arguing, and eventually, fighting in which she was badly injured.  Additionally, the prosecution presented evidence about several incidents of Butler's earlier uncharged violent criminal conduct toward Danielle, occurring from June through September 2011.  In June 2011, they argued by phone about infidelity and a sexually transmitted disease.  Butler went to Danielle's home, grabbed her around the neck, threw her into a wall and a door, then choked her and pushed her to the ground.  Danielle's friend, Samantha P., was present and called 911, reporting that Butler was threatening to cut Danielle's throat with his knife. After less than 10 minutes, Butler handed the knife to Danielle and left.  Butler was arrested and his knife confiscated from Danielle.  Butler told police that he gave the knife to Danielle because he was afraid something would happen. Butler did not have any explanation for police about the reasons for the June 2011 fight.

After the June 2011 incident, the court issued a criminal protective order dated July 18, 2011 that prohibited Butler from contacting Danielle. However, they continued to call, text and see each other occasionally.

In August 2011, Butler and Danielle were driving when he angrily hit her in the throat a few times, then stopped, pulled her out of the car, and kicked her in the face and stomach.  She did not go home to her parents until the next day because her injuries looked so bad.  She then called police and a report was taken.

On September 2011, Butler pled guilty to dissuading a witness from reporting a crime and was released on bail, pending sentencing in November

4

2011. Later in September 2011, Danielle sent him some nude photographs of herself and a female friend in sexual positions together, but she then asked for the pictures back. Butler refused and told her he was going to post the photographs on the Internet. Danielle threatened to file a police report.

On September 30, 2011, Butler sent text messages to Danielle and asked her to call him, but she did not do so. She and a friend were driving away from her home when they saw Butler in his car waiting around, and he then followed her car, honked his horn and interfered with her driving, trying to get her car to veer off the road. After a few days, Danielle made a police report about the incident.

In mid-October, Danielle sent text messages to Butler, and on October 15, 2011, they had a two-hour phone conversation. They started arguing about their relationship and infidelity, and Butler wanted to come to her house, which her parents had forbidden. She wanted to keep him away from her friends and family and agreed to come to his apartment, so she could say goodbye and have "closure." Bringing her overnight bag, Danielle drove her car to Butler's apartment around 2 a.m. For about two hours, they drank wine, talked, had consensual conventional sex, then fell asleep.

In the morning, Danielle told Butler she was going to church, but he discouraged her from doing so, and they spent the day together, eating and drinking numerous cocktails and beers at a few bars near his apartment, where they walked. He carried a knife in his pocket, as he usually did. They went to a sushi bar for dinner, but Danielle became nauseated and went to the restroom. According to her testimony, when she returned, Butler looked angrily at her and started asking her about her unfaithfulness, and telling her she had messed with the wrong person and was not going to have a good night. When he slapped her face, Danielle did not want to talk to the employees at the restaurant or make a scene, so they left, walking through a dark alley.

In the alley, Butler hit and kicked her, knocked her to the ground, and kicked her some more. When he pulled her up, she could not move her arm. Butler told her he was going to kill her and punched her in the stomach and beat her head into the ground. For about an hour, Butler dragged and pulled Danielle back toward his house, while he continued to hurt her. When they reached her parked car, Butler shoved her into the passenger seat and got in the driver's seat. She did not run away because she was afraid he would catch her and hurt her again. He unzipped his pants, showing he had an erection, and pulled Danielle's head down to his penis while he told her to orally copulate him. According to Danielle, he was holding the knife on his lap and

hitting her.  She told him to stop, but he continued to threaten her and force his penis into her mouth while he drove.  After they traveled this way for about a half-mile, Butler parked the car, took his clothes off, pulled Danielle by the hair into the back seat, and ripped off her clothes.  Danielle was on her hands and knees while he penetrated her anus several times with his penis, which hurt her.  When he finished, he got dressed and started driving toward a park at the end of the street, saying he was going to kill her there where it was dark and quiet, and she believed him.  He parked the car and started to pull her out by her hair.  As they struggled and she screamed, his knife went into her back about an inch and she started bleeding.

Butler then started walking Danielle toward the park, and they noticed that a neighbor near the park and others were watching.  Butler decided to go back to the car, Danielle got into the passenger seat, and he closed the door and walked around to the driver's seat.  At that point, Danielle opened her door, jumped out and ran toward the neighbor's house and bolted into it, crying, "He is going to kill me."  The neighbor, Anthony Lawrence, shut and locked the door, and had her sit down because she seemed to be hyperventilating.  Next, Danielle ran up the stairs to another room and collapsed, telling Lawrence and his roommate that Butler had raped, beaten and threatened her.  Lawrence called 911, telling the dispatcher that a young woman, who was a stranger to him, had run into his house to get away from a man who had been "dragging" her back to their car, while apparently using his knife to control her.  Before police responded, Butler knocked on the door and called for Danielle, but they did not answer and he left.

The responding police officer testified he found Danielle on a bed in Lawrence's house, in a bruised and hysterical condition.  She had a puncture wound in the center of her back and was bleeding all over the bed.  Blood was found on the sidewalk outside the house.  While being taken to a hospital, Danielle was crying and in pain.  She described to the responding officer and a detective how Butler attacked, threatened and forced her into sex acts.  She also reported she had consumed three beers and a gin and tonic that evening.  She gave a similar account to a deputy district attorney and the investigating detective the next day, and later at Butler's preliminary hearing.

At the hospital, Danielle was examined by medical personnel, including an orthopedic surgeon and a sexual assault response team (SART) nurse.  Danielle's injuries included a fractured wrist with significant displacement, caused by blunt force trauma, and a lacerated liver.  She was very "banged up" and in pain, with bruising and soreness in her face, back and anus, where she was bleeding.  The nurse could not fully examine Danielle's anal area,

16cv39-GPC-MDD

due to the pain, but the nurse saw one laceration there. The nurse's findings about injuries were consistent with Danielle's description of the incident, but the nurse could not rule out consensual sex as a causative factor.

Butler was arrested a few days later, at his new girlfriend's home in Oceanside. His vehicle was found in her garage.

At trial, Lawrence testified he heard a commotion outside his house at about 7:30 p.m. that day, so he looked outside and saw Butler "shepherding" Danielle by the arm back to a white car. She looked like she had been crying. After Danielle got in the car, Lawrence saw her jump out and run toward his house, screaming that her boyfriend was going to kill her, and saying she couldn't move her arm. He didn't think she seemed intoxicated.

The prosecution presented evidence about several incidents of Butler's earlier uncharged criminal violent conduct toward his ex-wife Jessica Butler, who was then also in the Marine Corps. They were married in January 2007 and had a violent argument in October 2007. When Butler slapped, pushed, and choked his then-wife, she lost consciousness. As a result, Butler pleaded guilty to a crime of domestic violence, and a criminal protective order prohibited him from contacting her. However, they continued to have a relationship.

Another violent incident took place between them in May 2008, when he threatened and chased Jessica, then seven months pregnant, and she jumped off a second-story balcony to get away from him. He ran after her and punched or kicked her, knocking her down. Butler served time in jail and in 2009, was dishonorably discharged from the Marine Corps for domestic violence.

At trial, the jury heard testimony from a domestic violence expert who explained the usual dynamics of such a relationship, such as why an abused woman might continue to return to her abuser. [Footnote: Rebuttal evidence was presented about an attack by Butler on a couple in November 2008, but it need not be summarized here.]

Butler testified in his defense, first explaining that in the Marines, he had received special training in martial arts and was a black belt instructor. He was a weapons enthusiast and usually carried a knife. During their relationship, he gave a knife to Danielle and taught her how to use it. However, he did not get his own knife back after he gave it to Danielle after the June 2011 incident.

7

16cv39-GPC-MDD

Butler acknowledged that both he and Danielle disrespected each other when they cheated on each other, during their relationship of one and a half years.  By June 2011, when they had the fight at her home, they had been together for about a year and she was angry that he had relationships with other women.  That day, she told him she was unfaithful to him, using a racial slur.  Butler said he pushed her against the wall, she apologized, and they both calmed down.  He did not open his knife that day.

During the incident in August 2011, he said Danielle got upset when he lost the keys to a car that she was driving, but they did not fight about it.  When he was arrested a few days later for assaulting Danielle, he denied it.  When Danielle sent him nude photographs of herself and a female friend in September, Butler refused to give them back.  He was upset about the August arrest and claimed that Danielle was threatening to lie to the police and file a false police report.  He testified he did not follow Danielle in his car on September 30.  By then, he had a new girlfriend and had moved on from Danielle and past relationships.

Butler testified that Danielle texted him "out of the blue" on October 13.  Although he was already in his new relationship and had decided to move on, he still had feelings for Danielle.  Two days later, he and Danielle talked on the phone for about two hours.  When he told Danielle about his new girlfriend, who was out of town, Danielle got upset that he had replaced her and she came to his apartment around 2:00 or 3:00 a.m.  They got along well and had consensual sex.  Danielle told him there was nobody like him among other men, and she wanted to "wait" for him until after his upcoming sentence was over (for dissuading a witness).

The next day they were happy to be together and went to a restaurant and several bars, and both of them had a number of drinks (beer and gin and tonics).  They were both drunk but able to talk about and plan on having anal sex at the park, which they had done before a few times.  At the restaurant where they went to eat dinner, they discussed infidelity, but without arguing about it.  Butler understood that he and Danielle had cheated on each other, but testified that this did not upset him, because that was the type of women that he dated, so he wasn't surprised.

Butler testified that when he and Danielle left the restaurant, they strolled back toward his apartment, taking in the night air, although they stumbled a bit because they were drunk.  They were still planning to drive together in Danielle's car to the nearby park to have sex, because Butler's roommate might be at home and he did not approve of their relationship.

When they got to the car, Danielle voluntarily performed oral sex on him. They found that the park was barricaded so they parked the car nearby, and Danielle went into the back seat and undressed. They continued the oral copulation and then they moved around to have anal sex, while she encouraged him. Butler testified that throughout the episode, he did not beat, punch, kick or push Danielle down, and he did not have his knife with him.

Afterwards, they got dressed and moved around in the car. Danielle didn't want to go home, even though she knew Butler's new girlfriend was coming back to him the next day. Butler and Danielle were both upset and frustrated about the way the day was going, and they argued about the new girlfriend. Butler heard a click, which he recognized as the sound of Danielle's knife opening, and she lunged at him with the knife. He was surprised and afraid because he had taught Danielle where to stab a person to kill him, and he thought she would do so. As he had been trained to do, he lunged at Danielle to disarm her, reaching for her wrist and hand and using his head and weight to pin her into the back seat. He bent and twisted her wrist, probably breaking it, then hit her in the chest a few times as "softening blows," for distraction. When he pulled Danielle's arm toward her body and twisted her wrist, he felt the blade "slide into her back" and saw that she arched up her back, causing the knife to drop out, so he put it in his pocket.

They then got out of the car and walked toward the park. Butler could see that Danielle's arm was hurt, but he did not seek medical help, since he knew he was violating the restraining order, they had just had a fight, and Danielle had a stab wound in her back. They were both stumbling and he held Danielle by the arm. When Butler noticed a neighbor was watching them, he was afraid that the noise of the fight had been heard from the car, so he decided to get away from the car. Danielle then slapped him and he pushed her to the ground. When he bent down to pick her up, she kicked him in the mouth. He kicked her about six more times, then picked her up, told her to stop because she was being unreasonable, and they went back toward the car.

Once Danielle ran away to the neighbor's house, saying that Butler was going to kill her, Butler decided he needed to "fix this," because it did not "look good." When he knocked on Lawrence's door, no one answered, so he walked back to his house. He then drove his truck to Oceanside to visit his girlfriend, where he was arrested a few days later.

In his testimony, Butler denied forcing Danielle to orally copulate him, and denied that any forcible sodomy took place, as she had agreed to all their

16cv39-GPC-MDD

sexual conduct.  He did not intend to stab her in the back.  Discussing infidelity with either his ex-wife or Danielle did not upset him.

The trial court took judicial notice of the protective order issued on July 18, 2011, prohibiting Butler from all contact with Danielle and requiring that he stay 100 yards away, and admitted the document into evidence.  Butler's felony conviction of September 8, 2011, for dissuading a witness from reporting a crime was also judicially noticed and admitted into evidence.  (§136.1, subd. (b)(1).)  The document showed that Butler was out on bail, awaiting sentencing, at the time of the October 2011 incidents.

The court held a series of jury instruction discussions, and Butler's counsel explained he was in a "delicate position" about the problem of proposing lesser included offense instructions, due to his concerns the jury might then enter into some kind of compromise.  The prosecutor withdrew that proposed instruction.  After doing some more research over the weekend, the court decided that no instructions on the lesser included offenses of attempted involuntary manslaughter would be appropriate, because no evidence supported them.

Before the case was submitted to the jury, one of the jurors notified the court he had received a Facebook advertisement about a criminal background check business that had a mug shot photo that looked somewhat like Butler.  The court questioned all of the jurors about it, then denied Butler's request for a mistrial.  Later, a new trial request on the same ground, and others, was denied.

During deliberations, the jury sent out notes requesting that several portions of the testimony be read back, but changed its request to hear only Butler's account.  Ultimately, the jury convicted Butler on all four counts, but did not find true that he had used a knife during the kidnapping or sex offenses, nor did he inflict great bodily injury, except in the forcible sodomy and the attempted murder.

(Lodgment No. 7, People v. Butler, No. D063890, slip op. at 5-15.)

## III.  **DISCUSSION**

Petitioner alleges his federal constitutional rights were violated by the failure of the trial court to sua sponte instruct the jury on: (a) attempted voluntary manslaughter as a lesser included offense of attempted murder (Claim 1); (b) his reasonable but mistaken

belief that the victim consented to the sexual activity (Claim 2); and (c) the defense of accident as to the stabbing of the victim (Claim 3). (Pet. at 16-31.) He also alleges the inquiry into the internet search of his criminal history by a juror was inadequate (Claim 4), and that he received ineffective assistance of counsel when defense counsel failed to object when the prosecutor accused him of tailoring his testimony, attacked defense counsel's integrity, expressed her personal opinion regarding his guilt, vouched for witnesses, and invited the jurors to put themselves in the place of the victim (Claim 5). (Id. at 32-46.)

Respondent argues that habeas relief is unavailable because Claims 1 and 2 do not present a federal issue, but even if they do the state court denial is objectively reasonable, that Claim 3 is unexhausted, procedurally defaulted and does not present a federal issue, but it can be denied notwithstanding the failure to exhaust because it is without merit, and that the state court denial of Claims 4 and 5 is objectively reasonable. (Answer at 22-61.) Petitioner agrees Claim 3 is unexhausted and procedurally defaulted and asks to withdraw it, but argues that his remaining claims have merit. (Traverse at 2, 13-37.)

### A.   Standard of Review

In order to obtain federal habeas relief with respect to claims which were adjudicated on their merits in state court, Petitioner must demonstrate that the state court adjudication of the claims: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d) (West 2006). Even if he can satisfy § 2254(d), or demonstrate it does not apply, he still must show that a federal constitutional violation occurred. Fry v. Pliler, 551 U.S. 112, 119-22 (2007); Frantz v. Hazey, 533 F.3d 724, 735-36 (9th Cir. 2008) (en banc). Petitioner must also demonstrate that any constitutional error is not harmless, unless it is of the type included on the Supreme Court's "short, purposely limited roster of structural errors." Gautt v. Lewis, 489 F.3d 993, 1015 (9th Cir. 2007), citing Arizona v. Fulminante, 499 U.S. 279, 306 (1991) (stating that "most constitutional errors can be harmless.")

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407. Relief under the "unreasonable application" clause of § 2254(d) is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." White v. Woodall, 572 U.S. ___, 134 S.Ct. 1697, 1706-07 (2014), quoting Harrington v. Richter, 562 U.S. 86, 103 (2011).

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. . . . Rather, that application must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted). In order to satisfy § 2254(d)(2), a federal habeas petitioner must demonstrate that the factual findings upon which the state court's adjudication of his claims rest, assuming it rests upon a determination of the facts, are objectively unreasonable. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

"As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. "If this standard is difficult to meet, that is because it was meant to be . . . [as it] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court decision conflicts with this Court's precedents." Id. at 102.

## B.    Claim 1

Petitioner alleges in Claim 1 that his federal constitutional rights were violated by the failure of the trial court to sua sponte instruct the jury on attempted voluntary manslaughter as a lesser included offense of attempted murder. (Pet. at 16-21.) He claims the record is replete with evidence that he acted under the heat of passion and with an actual but unreasonable belief in the need to defend himself, and the trial court therefore erred in finding there was insufficient evidence of attempted voluntary manslaughter to support the instruction. (Id. at 17-18.)

Respondent answers that the failure to instruct on a lesser included offense does not raise a federal question. (Answer at 22-23.) Respondent acknowledges that the Ninth Circuit has found that a federal due process violation can arise from the failure to instruct where the evidence warrants it, but argues that no federal due process violation arose here because the state court correctly found there was insufficient evidence to support the instruction. (Id. at 23-37.) Respondent argues that the state court denial of the claim on that basis is not contrary to, and did not involve an objectively unreasonable application of, clearly established federal law. (Id.)

Petitioner presented this claim to the state supreme court, which summarily denied it without a statement of reasoning. (Lodgment Nos. 8-9.) It was previously presented to the state appellate court and denied in a written opinion. (Lodgment Nos. 3-7.) There is a presumption that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." Ylst v. Nunnemaker, 501 U.S. 797, 803-06 (1991).

The last reasoned state court decision with respect to this claim is the appellate court opinion affirming Petitioner's convictions on direct appeal, which stated:

Butler claims the trial court erred by instructing the jury on the attempted murder count, without adding, sua sponte, instructions on the lesser included offense of attempted voluntary manslaughter. He argues his rights were not fully protected, to have the jury determine every material issue presented by the evidence, including his theories of "'sudden quarrel or heat of passion' (§ 192, subd. (a))," or his "unreasonable but good faith belief in

13

having to act in self-defense." (*People v. Barton* (1995) 12 Cal.4th 186, 198–199 (*Barton*); *People v. Cunningham* (2001) 25 Cal.4th 926, 1007–1009 (*Cunningham*).)

In criminal cases, """"even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. (Citations.)  The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case."""" (*Breverman, supra*, 19 Cal.4th at p. 154.)  In this context, substantial evidence means evidence from which a reasonable jury could conclude the defendant committed the lesser offense, instead of the greater one.  (*Id*. at p. 162.)  In deciding if there is substantial evidence of a lesser offense, however, the courts will not evaluate the credibility of witnesses, which is the jury's prerogative.  (*Ibid*.)  On review in this context, we construe the evidence in the light most favorable to the appellant.  (*People v. Turk* (2008) 164 Cal.App.4th 1361, 1368, fn. 5.)

In *Breverman, supra*, 19 Cal.4th at pp. 153–154, the court set out the distinctions between murder (the unlawful killing of a human being with malice aforethought, § 187, subd. (a)), and voluntary manslaughter (§ 192), where a defendant has killed intentionally and unlawfully, but without malice.  (*Breverman*, at p. 153; *Barton, supra*, 12 Cal.4th at p. 199.)  "But a defendant who intentionally and unlawfully kills *lacks malice* . . . in limited, explicitly defined circumstances: either when the defendant acts in a 'sudden quarrel or heat of passion' (§ 192, subd. (a)), or when the defendant kills in 'unreasonable self-defense'—the unreasonable but good faith belief in having to act in self-defense."  (*Barton*, at p. 199; italics added.)

The jury was instructed that the People were required to prove that Butler took at least one direct but ineffective act toward accomplishing attempted murder, and that he intended to kill Danielle.  (CALCRIM No. 600.)  Such "intent or intention is manifested by the circumstances connected with the offense."  (§ 29.2, subd. (a).)  The court further instructed the jury about how to complete its verdict forms, including those for any lesser included offenses that it concluded had been proven by the evidence.  These included forms of kidnapping, false imprisonment, and assault.  If the jury was not persuaded by the evidence that Butler was guilty beyond a reasonable doubt, it must find him not guilty.

During several court sessions the court thoroughly discussed the proposed instructions with counsel, and inquired whether an instruction was

being pursued to state that attempted voluntary manslaughter was the only lesser included offense for attempted murder. Although the prosecutor had requested such an instruction, she withdrew it. Defense counsel told the court that in light of the defense being presented, that Butler had acted in self-defense, a lesser included offense instruction would put the defense in a "very delicate situation," and he was reluctant to give the jury that option of "split(ting) the baby (in half)" (e.g., convicting on a lesser offense instead of acquitting). The court concluded that no instruction on attempted voluntary manslaughter would be given, because there were no facts to support it, and "I don't believe there's any evidence to support that." Defense counsel agreed.

On Butler's contention that the sequence of events proven at trial does not demonstrate the required element of malice, we next examine the record for substantial support in the evidence of his claimed extreme provocation by Danielle. (*People v. Rogers* (2006) 39 Cal.4th 826, 866–867.) Some levels of provocation can cause a person to take actions out of a heat of passion, not out of reflective judgment. (*Le, supra*, 158 Cal.App.4th at p. 525; *People v. Berry* (1976) 18 Cal.3d 509, 515; *People v. Borchers* (1958) 50 Cal.2d 321.) In this context of intimate partner violence, such "provocative conduct may be physical or verbal, and it may comprise a single incident or numerous incidents over a period of time." (*Le*, at p. 528.) "'The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim (citation), or be conduct reasonably believed by the defendant to have been engaged in by the victim.'" (*Ibid*.; *Berry*, at pp. 515–516.)

Butler thus argues the evidence showed the unlawful attempted killing might constitute voluntary manslaughter, such as "if the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an "'ordinary (person) of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.'''" (*Breverman, supra*, 19 Cal.4th at p. 163.)

Butler points to the evidence in the record that his relationship with Danielle had been tumultuous for about a year, including violence, and that she acknowledged that when the topic of infidelity came up, they often argued and fought. Danielle nevertheless kept up this roller coaster relationship with Butler and initiated contact several times, including October 2011. She ignored the July 2011 criminal protective order that prohibited Butler from contacting her, and thus seemed to become accustomed to being beaten by him. According to Butler, she had recently enticed him into sexual situations by coming over to his home to spend the night, and recently sent him

15

suggestive nude photos of herself. He points out that he and Danielle had been getting along well the day of the incident, until they suddenly started fighting about her infidelity while waiting for dinner. Butler thus argues that both objectively and subjectively speaking, he showed to the jury that he was likely provoked by such interactions into attacking Danielle in a heat of passion.

We disagree. Even viewing the evidence in the light most favorable to the defendant, we cannot say there was enough evidence of actual provocation by Danielle to send to the jury, for consideration whether such a heat of passion defense was tenable. Unlike in *Le*, *supra*, 158 Cal.App.4th at p. 529, this was not a long term relationship or marriage in which a spouse used her affair with a third party as a tool to humiliate the other spouse and to create a taunting event that "simply served as the spark that caused this powder keg of accumulated provocation to explode." (*Ibid*.) Rather, the evidence showed that Butler understood that the type of women he dated were prone to cheating on him, and he in turn consistently cheated on his girlfriends. The evidence about ongoing infidelity in the relationship does not support any finding that Butler's acts of violence on this date arose out of that type of provocation. (*Cunningham, supra*, 25 Cal.4th at p. 1009.)

To assert this ground of instruction, the evidence need not show any specific type of provocation, and "the passion aroused need not be anger or rage, but can be any ""'(v)iolent, intense, high-wrought or enthusiastic emotion"'" (citations) other than revenge." (*Breverman, supra*, 19 Cal.4th at p. 163.) When they left the restaurant, Danielle thought Butler seemed "enraged" while they walked into the alley. Even though he had angry exchanges with Danielle on the day of this incident, Butler has raised no evidence to show that his attacks on her were in reaction to any identifiable provocative words or actions that directly precipitated his conduct. Even when describing how she lunged at him with a knife, Butler's version was that he kept his head and defended himself according to his training.

Finally, we note that during jury instruction discussions, Butler's counsel did not object when the prosecutor withdrew the instruction on the lesser included offenses of attempted voluntary manslaughter, or when the court decided not to give it. The evidence simply did not justify a conviction of such a lesser offense, with respect to any provocation or instigation by Danielle. (*Breverman, supra*, 19 Cal.4th at pp. 153–154; *Cunningham, supra*, 25 Cal.4th at pp. 1007–1008.)

16

"(I)mperfect self-defense is not a true defense; it is rather 'a shorthand description' of one form of the crime of voluntary manslaughter. (Citation.) Thus, a trial court's duty to instruct on this theory arises 'whenever the evidence is such that a jury could reasonably conclude that the defendant killed the victim in the unreasonable but good faith belief in having to act in self-defense.'" (*Rogers, supra*, 39 Cal.4th at p. 883, citing *Barton, supra*, 12 Cal.4th at p. 201.)

The doctrine of imperfect self-defense is a narrow one, that will apply "only when the defendant has an actual belief in the need for self-defense and only when the defendant fears immediate harm that ""must be instantly dealt with."'" (*Rogers, supra*, 39 Cal.4th at p. 883.) If the defendant can show his "'honest but unreasonable belief that it is necessary to defend (himself) from imminent peril to life or great bodily injury,'" he is entitled to a conclusion that no malice existed, and the charged offense is reduced to manslaughter. (*Ibid.*)

Here, the trial court instructed the jury on the doctrine of justifiable self-defense, and stated the People had the burden of proving beyond a reasonable doubt that Butler did not act in self-defense. The court explained to the jury that it could find Butler had acted lawfully if he acted in self-defense in stabbing Danielle, if he reasonably believed he was in imminent danger of suffering bodily injury, and if he reasonably believed that the immediate use of force was necessary to defend against that danger, and if he used no more force than was reasonably necessary to defend against the danger.

These instructions also told the jury, "If the defendant used more force than was reasonable, the defendant did not act in lawful self-defense. (¶) When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed." Further, the jury was instructed that a person does not have a right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force. The instructions next stated that the right to use force in self-defense will continue only as long as the danger exists or reasonably attempts to exist, or while the attacker appears capable of inflicting injury.

According to Butler, the sequence of events proven at trial does not demonstrate the required element of malice for the attempted murder charge, because of his reasonably formed and honest, but mistaken, belief that he needed to defend himself from Danielle's immediate threat to his bodily

16cv39-GPC-MDD

integrity and his life. (*Rogers, supra*, 39 Cal.4th at p. 883.) The jury rejected his claim of actual self-defense, but he continues to argue that he could have been reasonably mistaken about the need to defend himself. For example, he points out that Danielle is smaller and weaker than he is, and he was highly trained in the martial arts and probably should have been readily able to fight her off, but he mistakenly went on to resist her, taking her knife away, and then felt the knife go in her back.

This record does not show substantial evidentiary support that Butler could have been reasonably misled by Danielle's offensive, aggressive actions toward him that day in the car, to cause him to mistakenly conclude that he had to defend himself. Danielle testified that she did not carry the knife he had given her, but that Butler had a knife that day. Although Butler told the jury he taught Danielle how to use a knife, and feared that she would fatally stab him, such testimony did not support a theory of imperfect self-defense. He has brought forward no evidence to support his appellate contention that he was somehow mistaken into believing that Danielle's physical condition, actions and circumstances posed a credible threat to his life and well-being, and this caused him to use the knife on her. There was no substantial evidence from which the jury could have concluded he tried to kill Danielle "due to an honest but unreasonable belief that he needed to defend himself from an imminent threat to his life or to his bodily integrity." (*Rogers, supra*, 39 Cal.4th at p. 883.)

Again we note that during jury instruction discussions, the court stated it would not instruct on attempted voluntary manslaughter because there was no evidence in support of that charge. Butler was pursuing a different approach, by claiming true self-defense. No sua sponte instructional duty arose in this respect.

(Lodgment No. 7, <u>People v. Butler</u>, No. D063890, slip op. at 15-23.)

Clearly established federal law provides that in order to establish a federal due process violation by the failure to give a jury instruction, Petitioner must demonstrate that its omission "so infected the entire trial that the resulting conviction violates due process." <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154 (1977), quoting <u>Cupp v. Naughten</u>, 414 U.S. 141, 147 (1973). Where the failure to give an instruction is in issue, the burden on the petitioner is "especially heavy." <u>Kibbe</u>, 431 U.S. at 155.

///

16cv39-GPC-MDD

A state court's "failure to correctly instruct the jury on a defense may deprive the defendant of his due process right to present a defense." Bradley v. Duncan, 315 F.3d 1091, 1099 (9th Cir. 2002); see also United States v. Fejes, 232 F.3d 696, 702 (9th Cir. 2000) ("A defendant is entitled to have the judge instruct the jury on his theory of defense provided it is supported by law and has some foundation in the evidence.") Even if the trial court's failure to give the instruction violated due process, habeas relief would still not be available unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); California v. Roy, 519 U.S. 2, 5 (1996).

As the state court pointed out, there is insufficient evidence Petitioner acted from heat of passion to support an instruction on attempted voluntary manslaughter as a lesser included offense of attempted murder. The victim testified that she and Petitioner argued at a restaurant, and that he kicked, punched, grabbed and dragged her from the restaurant to her vehicle where he sexually assaulted her. (Lodgment No. 1, Reporter's Tr. ["RT"] at 345-62.) Petitioner testified they did not argue, but were "strolling, enjoying the night air, talking," on their way from the restaurant to her vehicle where they engaged in consensual sex. (RT 1084-87.) He testified that after they had sex he told the victim that his former girlfriend was moving back in with him and that he and the victim could no longer see each other, a subject they had discussed earlier in the day, the victim responded by getting upset and attacking him with a knife. (RT 1093-95.) Petitioner testified that he kept his head and relied on his military training to defend himself and disarm her, but she was accidentally stabbed during the struggle. (RT 1096-99.)

As the state court pointed out, Petitioner and the victim both testified that they routinely cheated on each other. (RT 329, 341, 465, 1049-50.) The victim testified that they had discussed that issue calmly earlier in the day, but all the other times they had ever discussed it Petitioner had become violent. (RT 329, 485.) Even if the state court erred in finding that it was a subject unlikely to give rise to the kind of provocation necessary to show Petitioner acted under the heat of passion, there was no evidence from which the jury

could have found that Petitioner intentionally stabbed the victim in the heat of passion. Such a finding would have been incompatible with the testimony of both Petitioner and the victim. Moreover, it was not only unnecessary to allow Petitioner to present his defense of self-defense, but would have conflicted with his defense. The state court denial of Claim 1 on the basis that no federal due process violation arose from the failure to give an instruction on attempted voluntary manslaughter, is therefore neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts. Miller-El, 537 U.S. at 340; Williams, 529 U.S. at 405-06; Bradley, 315 F.3d at 1099; Fejes, 232 F.3d at 702.

Furthermore, even if Petitioner could satisfy the provisions of 28 U.S.C. § 2254(d), he must still show that a federal due process violation occurred, and that the failure to instruct had a substantial and injurious effect or influence on the jury's verdict. Fry, 551 U.S. at 119-22; Brecht, 507 U.S. at 637. The victim testified that when she left the restaurant with Petitioner he kicked, punched, grabbed and pulled her for over an hour as he forced her to walk with him toward his residence where her car was parked, telling her "over and over again" along the way that he was going to kill her. (RT 345-52.) She said he then forced her into her vehicle, forced her to orally copulate him while he drove toward a park where he raped her, along the way telling her he was taking her to the park to kill her, and then stabbed her as she tried to escape. (RT 353-62.) She said Petitioner was holding a knife "the whole time." (RT 361.) Petitioner, on the other hand, testified that they left the restaurant together in a good mood, took a pleasant stroll back toward his residence, and had consensual sex in her vehicle. (RT 1085-91.) He testified that after they had sex she attacked him with a knife when he told her they would have to stop seeing each other because a former girlfriend was moving back in with him, and that he accidentally stabbed her and broke her wrist as he was acting in self-defense attempting to disarm her in a manner consistent with his military training. (RT 1085-1104, 1121.)

Thus, the jurors were faced with a credibility determination whether to believe the victim's story that Petitioner brutally beat, kidnapped, raped and tried to kill her, or his

story of a romantic evening which suddenly turned violent when she attacked him with a knife in response to his telling her he was abandoning their relationship and returning to a former girlfriend. The jurors were instructed that in order to convict Petitioner of attempted murder the prosecution had to prove he intended to kill the victim. (RT 1224.) Petitioner is incorrect that evidence of their tumultuous past supported further instructing the jury that they could convict him of attempted voluntary manslaughter if they found he deliberately stabbed the victim in response to provocation. It was not supported by the victim's testimony that he said he was going to kill her and stabbed her when she tried to escape, and was not supported by Petitioner's testimony that he kept his head and inadvertently stabbed the victim while using his military training to disarm her. It would have conflicted with his chosen defense of self-defense resulting in an accidental stabbing. Even if there is some evidence in the record that the nature of their relationship could have given rise to provocation under some circumstances, there is no evidence such circumstances arose. Thus, the lack of evidence to support the instruction, and the fact that it was unnecessary to present a defense and could have undermined Petitioner's chosen defense, precludes a finding of a federal due process violation arising from the failure to sua sponte give the instruction. Bradley, 315 F.3d at 1099; Fejes, 232 F.3d at 702. Petitioner has not satisfied his "heavy burden" of showing that the failure to sua sponte instruct the jury on the lesser included offense of attempted voluntary manslughter "so infected the entire trial that the resulting conviction violates due process." Kibbe, 431 U.S. at 154-55; Cupp, 414 U.S. at 147. But even if the failure to give the instruction violated due process, it is clear that the error did not have a "substantial and injurious effect or influence in determining the jury's verdict," not only because the jury found Petitioner intended to kill the victim, but because there was no evidence from which the jury could find that he intentionally stabbed the victim in the heat of passion. Brecht, 507 U.S. at 637.

The Court finds that the adjudication of Claim 1 by the state court is objectively reasonable, that Petitioner has not demonstrated a federal due process violation, and that any error is harmless. The Court recommends habeas relief be denied as to Claim 1.

## C.    Claim 2

Petitioner alleges in Claim 2 that his federal constitutional rights were violated by the failure of the trial court to sua sponte instruct the jury on the defense of mistaken belief in consent.  (Pet. at 22.)  He points to evidence which he argues supports a finding that he reasonably, although perhaps mistakenly, believed the victim consented to the sex acts, including: (a) his testimony that the sex acts were consensual; (b) the victim recently re-initiated their relationship by sending him nude photographs of herself; (c) their history of consensual sex, including earlier that day; and (d) the fact that the jury found not true the allegations that he used a knife during the sex offenses and inflicted great bodily injury during the forcible oral copulation count, despite the victim's testimony that he did, indicating they did not believe at least some of her testimony.  (Id. at 22-25.)

Respondent answers that this claim does not present a federal question because the failure to instruct did not rise to the level of a federal due process violation.  (Answer at 37.)  Respondent argues that even if the failure to instruct could have risen to the level of a federal due process violation, the state court correctly found there was insufficient evidence to support the instruction, and the denial of the claim by the state court on that basis is therefore neither contrary to, nor involves an unreasonable application of, clearly established federal law.  (Id. at 37-42.)

The Court will look through the silent denial of this claim by the state supreme court to the last reasoned state court decision, the appellate court opinion on direct appeal, which stated:

> The jury instructions given by the trial court included CALCRIM Nos. 1015 and 1030 on the People's obligation to prove that the charged sexual acts had occurred, without the free and voluntary consent of the victim, who knew the nature of the act.  The instruction stated, "Evidence that the defendant and the person dated is not enough by itself to constitute consent."  Additionally, the trial court instructed the jury that it could consider the evidence that Danielle had previously had consensual sexual intercourse with Butler, but only to help it decide whether she had consented to the charged acts, and whether Butler reasonably and in good faith believed that she consented in that way.

22

16cv39-GPC-MDD

Counsel for Butler argued to the jury that Butler had an actual and reasonable belief that Danielle had consented to the sexual acts that occurred, which provided him the defense of actual consent to the charges of forcible oral copulation and sodomy. On appeal, Butler argues the trial court violated his constitutional right to fully present his defense that he mistakenly believed Danielle had consented to their sexual activity, since the court did not give a *Mayberry* instruction, sua sponte (*Mayberry, supra*, 15 Cal.3d at pp. 153–158). The focus of such an instruction is to guide the jury's consideration of any existing "*substantial evidence* that the defendant honestly and reasonably, *but mistakenly*, believed that the victim consented to sexual intercourse." (*Williams, supra*, 4 Cal.4th at p. 361, italics added.)

Generally, a sua sponte instruction on a defense must be supported by substantial evidence and may not be inconsistent with the defendant's theory of the case. (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.) A trial court must give such a consent instruction sua sponte "only when the defense is supported by 'substantial evidence,' that is, evidence sufficient to 'deserve consideration by the jury,' *not 'whenever any evidence is presented, no matter how weak.'*" (*Williams, supra*, 4 Cal.4th at pp. 360–361.)

This *Mayberry* defense "has two components, one subjective, and one objective. The subjective component asks whether the defendant honestly and in good faith, albeit mistakenly, believed that the victim consented. . . . In order to satisfy this component, a defendant must adduce evidence of *the victim's equivocal conduct* on the basis of which he erroneously believed there was consent. (¶) In addition, the defendant must satisfy the objective component, which asks whether the defendant's mistake regarding consent was reasonable under the circumstances. Thus, regardless of how strongly a defendant may subjectively believe a person has consented to sexual intercourse, that belief must be formed under circumstances society will tolerate as reasonable in order for the defendant to have adduced substantial evidence giving rise to a *Mayberry* instruction." (*Williams, supra*, 4 Cal.4th at pp. 360–361, fn. omitted; italics added.)

In *People v. Hernandez* (2009) 180 Cal.App.4th 337, 345–346, this court explained that even if a defendant can bring forward facts of the victim's equivocal conduct that supported his claim he subjectively believed she had consented to sexual conduct, those facts that are arguably equivocal "must be viewed in the context of the circumstances surrounding the conduct he described." There, the objective portion of the test could not be satisfied to support instructions on a theory of consent, because the record showed the defendant had broken into the victim's home, in the early hours of the

23

morning, carrying and showing a two-foot long metal bar, thrown her phones out of reach, told her he had killed a policeman, and he "gave her 10 minutes to give in to his demands for sex or 'something bad was going to happen.'" (*Hernandez*, at p. 345.) Also, the victim was attempting to protect her baby when she stopped physically resisting his demands, and only after the defendant threatened her with "'"force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another."'" (*Ibid.*, citing *Williams, supra*, 4 Cal.4th at p. 364.) This court found it was not error for the trial court to omit instructions about the victim's supposed consent, because the objective standard for the defendant's reasonable reliance on her conduct was not met. Thus, "it was unreasonable as a matter of law for Hernandez to believe the victim consented to sexual intercourse." (*Hernandez*, at pp. 345–346.)

According to Butler, the sequence of events proven at trial is consistent with his theory that if Danielle did not actually consent to the oral copulation and sodomy incidents, he mistakenly believed that she did so. The evidence showed that for over a year, their relationship had included breakups, reconciliations, and incidents of violence, but Danielle was not deterred from associating with him. He thus argues she displayed "equivocal conduct that could be reasonably and in good faith relied on to form a mistaken belief of consent, despite the alleged temporal context in which that equivocal conduct occurred." (*Williams, supra*, 4 Cal.4th at p. 364; *Hernandez, supra*, 180 Cal.App.4th at pp. 345–346.) This might satisfy the subjective component required to justify presentation of this defense.

On the objective portion of the test, Butler points out that the jury did not find true the weapons use enhancements on the sex offenses, and thus the jury did not believe Danielle's testimony that he had the knife in his lap while the oral copulation was going on. In *Williams*, the court acknowledged that in such situations, a jury might believe parts of the defendant's version of events and also parts of the victim's version. (*Williams, supra*, 4 Cal.4th at p. 364.) Thus, Butler contends all the evidence would have justified submitting "the full issue of consent to the jury for determination," such as whether he was led into mistake and formed a reasonable belief of her consent.

When we view Danielle's "equivocal" conduct, we do so "in the context of the circumstances surrounding the conduct (defendant) described." (*Hernandez, supra*, 180 Cal.App.4th at pp. 345–346.) Whether or not Butler *subjectively* believed that Danielle consented to sexual conduct that day, the circumstances of how they got to the car, where the conduct occurred, do not satisfy the *objective* component of the *Williams* analysis. (*Ibid.*) Butler

suddenly got angry with Danielle in the restaurant, told her she was not going to have a good night, marched her to an alley where he beat her, then marched her back to the car while beating her some more, then forced her into the car. Although they had participated in consensual sex approximately 12 hours earlier, those intervening circumstances must be considered in evaluating whether Butler could have formed a reasonable but mistaken belief, based upon the history of their relationship, that she consented to these acts that day in the car. The objective component of the *Williams* analysis is not satisfied here. This proposed defense of mistake is unsupported by any substantial evidence in the record.

The trial court would have had no justification for giving a sua sponte instruction on a possible mistaken but reasonable belief in Danielle's consent to the sexual conduct. Butler did not carry his burden to present evidence raising a reasonable doubt about an objectively reasonable but mistaken belief that he was not forcing sex.

Because we have found no error occurred on either this ground or a lesser included offense instruction, we need not reach Butler's arguments about the application of harmless error theory or federal constitutional standards for evaluating such error. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18, 24.)

(Lodgment No. 7, <u>People v. Butler</u>, No. D063890, slip op. at 23-27.)

As with the previous claim, Petitioner must overcome a "heavy burden" of showing that the failure to instruct the jury on his possible but mistaken belief in the victim's consent "so infected the entire trial that the resulting conviction violates due process." <u>Kibbe</u>, 431 U.S. at 154-55; <u>Cupp</u>, 414 U.S. at 147. Petitioner has not made that showing because, as the appellate court correctly found, even if he subjectively but mistakenly believed the victim consented based on their stormy history, there is insufficient evidence in the record to show he could have objectively but mistakenly believed she consented.

The victim testified that Petitioner got angry at the restaurant and forced her to walk to his residence, kicking, punching, dragging and pushing her along the way and telling her he was going to kill her. (RT 345-46.) When they arrived at her car, which was parked near his residence, she said he pulled out his knife and pushed her into the car. (RT 352.) She testified that Petitioner then got in the car, unzipped his pants to reveal his erect penis,

and pulled her hair by the back of her neck and forced her mouth onto his penis; he then drove away while forcing her to orally copulate him.  (RT 354-56.)  Petitioner parked, undressed, and forced her into the back seat of the two-door car.  (RT 356.)  He ripped her clothes off, and when she was completely naked he penetrated her anus with his penis without lubricant, which caused her great pain.  (RT 357-58.)  She testified that after he ejaculated inside her anus, he climbed back into the front seat, dressed quickly and drove away saying he was taking her to a park to kill her.  (RT 358-60.)  They stopped near a park where Petitioner pulled her out of the car by her hair, and when she screamed for help he put his hand on her mouth and stabbed her in the back.  (RT 360-61.)  At that point a stranger intervened and she was taken to the hospital in an ambulance.  (RT 361-64.)  Her treating physicians testified that she had a stab wound to her back, a tear in her anus, a lacerated liver probably caused by being punched or kicked in the stomach, bruises to both inner thighs, and a left wrist fracture so severe and "horrific" as to warrant surgery, all resulting in four days of hospitalization.  (RT 431, 738-48.)  Petitioner, on the other hand, testified that they had a pleasant stroll to the car, consensual oral sex as he drove to the park, and consensual anal sex in the back seat while they were parked.  (RT 1087-91.)  He testified that the victim got angry and attacked him with a knife when he told her, immediately after they had sex, that a former girlfriend was moving back in with him and he and the victim would stop seeing each other, and that he inadvertently broke her wrist and accidentally stabbed her while disarming her.  (RT 1093-1101, 1121.)

It was objectively reasonable for the state appellate court to find that insufficient evidence existed to support instructing the jury that if Petitioner mistakenly believed the victim consented to the sex acts he could not be found guilty of the forcible sex offenses.  The jury was instructed that the prosecution bore the burden of proving beyond a reasonable doubt that the victim did not consent to the sex acts, and that Petitioner accomplished the sex acts "by force, violence, duress, menace or fear of an immediate and unlawful bodily injury."  (RT 1231-32.)  Defense counsel argued to the jury that the victim was "a vengeful woman" who lied in order to hurt Petitioner, and that Petitioner actually

26

and reasonably believed that the victim consented.  (RT 1301.)  The jury obviously rejected that defense, and it was objectively reasonable for the state court to find that in light of the evidence regarding how Petitioner and the victim left the restaurant and arrived at the car, and in particular the severity of the victim's injuries, insufficient evidence existed to give an instruction on a reasonable but mistaken belief that the victim consented to the sex acts. Miller-El, 537 U.S. at 340; Williams, 529 U.S. at 405-06; Bradley, 315 F.3d at 1099; Fejes, 232 F.3d at 702.  Because there is no evidence from which the jury could have found that Petitioner had an actual but mistaken belief the victim consented, and because the instruction was not necessary for his defense, and in fact conflicted with his testimony that she initiated the sex (RT 1088), he has not carried his "heavy burden" of showing that a federal due process violation arose from the failure to give the instruction.  Kibbe, 431 U.S. at 154-55; Cupp, 414 U.S. at 147.

Even assuming Petitioner could satisfy the provisions of 28 U.S.C. § 2254(d), and further assuming he could demonstrate a federal due process violation arose from the failure to give the instruction, any error is clearly harmless because it could not have had a substantial and injurious effect or influence on the jury's verdict.  The jury was provided with two stark versions of the events, and chose to believe the victim.  Petitioner argues that the jury did not believe her testimony that he brandished a knife during the sex acts, and did not believe her testimony that he inflicted great bodily injury on her during the forcible oral copulation count, because they returned not true findings on those allegations. (Pet. at 25.)  However, the five-foot, three-inch tall victim testified that she was forced to engage in the sex acts by a young, strong ex-Marine, and the jury could have reasonably found she was forced to submit irrespective of whether he brandished a knife during the sex acts.  Her testimony was vague regarding his use of the knife during the sex acts.  (RT 361: "I saw [the knife] the whole time."; RT 352: "He pulled the knife out even before we got into my car.")  She testified that the knife was on his lap while he forced her to orally copulate him (RT 354), but was not sure if the knife was open.  (RT 506.)  Thus, it is clear that the jury could have found the allegations that Petitioner used a knife during the sex

acts had not been proven beyond a reasonable doubt, without finding that the victim testified untruthfully.  Likewise, evidence they had consensual sex earlier that day and throughout their relationship, when viewed in light of the severity of the victim's injuries arising from the events of that night, does not support an instruction that Petitioner actually but mistakenly believed the victim consented to the sex acts that night.  The Court finds that the failure to instruct the jury in that manner did not have a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637; Roy, 519 U.S. at 5.

The Court finds that the adjudication of Claim 2 by the state court is objectively reasonable, that Petitioner has not demonstrated a federal due process violation, and that any error is harmless.  The Court recommends habeas relief be denied as to Claim 2.

### D.    Claim 3

Petitioner alleges in Claim 3 that his federal constitutional rights were violated by the trial court's failure to sua sponte instruct the jury on the defense of accident.  (Pet. at 28-31.)  He argues that the victim's knife wound was caused during a struggle, and that there was a factual dispute as to whether the wound was accidental or intentional.  (Id.)

Respondent answers that this claim is not cognizable on federal habeas because it presents an issue of state law only.  (Answer at 42-43.)  Respondent argues that if the claim is read as presenting a federal issue, it is unexhausted because no state court has ever addressed it, and that it is procedurally defaulted because Petitioner no longer has state court remedies available to him.  (Id.)  Respondent also argues that the claim can be denied notwithstanding the failure to exhaust because there is insufficient evidence to support the instruction, and because any federal error is harmless.  (Id. at 43-45.)  Petitioner agrees the claim is unexhausted and procedurally defaulted, and seeks to withdraw it from the Petition.  (Traverse at 2, 22.)

Claim 3 was presented to the state supreme court in the petition for review.  (Lodgment No. 8 at 22-25.)  In that petition, Petitioner's appointed appellate counsel argued that: "Because of the Court of Appeal's failure to address this contention, and in

light of other issues passed over by the court, appellant requests remand and rehearing so the Court of Appeal can address all of his contentions and grant the requested relief."  (Id. at 26.)  His same counsel had presented Claim 3 to the appellate court in the opening brief on direct appeal (Lodgment No. 3 at 40-44), but prior to the People filing a responsive brief sent a letter to the appellate court stating: "It has been brought to my attention that the argument raised in Claim III of the appellant's opening brief has been resolved by the California Supreme Court and there is no longer a sua sponte duty for the court to instruct on the defense of accident.  Please strike that argument at pages 40 to 44 of the brief.  I apologize for the error and any inconvenience to the court."  (Lodgment No. 4 at 1.)

The record is not clear why counsel raised the claim in the state supreme court after withdrawing it from the appellate court, and unclear why counsel thereafter requested the state supreme court to remand to the appellate court with instructions to address the claim. The appellate court was certainly bound by state supreme court precedent rejecting the claim, and withdrawing it from consideration by the appellate court after discovering that precedent is understandable, as is presenting it to the state supreme court which is not precluded from reconsidering their own precedent.  Respondent argues, without analysis, that the claim is unexhausted because it was withdrawn from the appellate court brief. (Answer at 43.)    Respondent also contends it is now procedurally defaulted because Petitioner no longer has state court remedies available.  (Id.)

In order to exhaust state judicial remedies, a state prisoner must present the state's highest court with a fair opportunity to rule on the merits of every issue raised in their federal habeas petition.  Granberry v. Greer, 481 U.S. 129, 133-34 (1987); Duncan v. Henry, 513 U.S. 364, 365-66 (1995).  The claim must be "fairly presented" to the state court, that is, in a manner which allows that court to have "the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding."  Picard v. Connor, 404 U.S. 270, 275-76 (1971).  The "fair presentation" requirement is not satisfied where a claim is presented in a manner which precludes consideration by the state court.  Castille v. Peoples, 489 U.S. 346, 351 (1989).

16cv39-GPC-MDD

The exhaustion requirement also can be met if there is an absence of state judicial remedies. Castille, 489 U.S. at 351 ("The requisite exhaustion may nonetheless exist, of course, if it is clear that respondent's claims are now procedurally barred under [state] law."), citing Engle v. Isaac, 456 U.S. 107, 125 n.28 (1982) ("[The exhaustion] requirement, however, refers only to remedies still available at the time of the federal petition.")  In addition, federal courts have discretion to deny a habeas application on the merits notwithstanding a petitioner's failure to exhaust state remedies.  See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.")

Although Petitioner's appointed appellate counsel withdrew the claim from the appellate court brief, counsel included it in the state supreme court petition for review and requested a remand for consideration of the claim.  Thus, it does not appear that Claim 3 was presented to the state supreme court in a manner which precluded that court from considering the claim, and the exhaustion requirement is therefore satisfied.  Castille, 489 U.S. at 351.  As set forth below, the silent denial of the claim by the state supreme court is presumed to be an adjudication on the merits of the claim.  The Court recommends rejecting Respondent's contention that because the claim was withdrawn from the appellate court it is unexhausted.  Because Respondent's argument the claim is procedurally defaulted is predicated on a failure to exhaust, the Court also recommends rejecting Respondent's contention that the claim is procedurally defaulted.

In his Traverse Petitioner states: "The claim of failure to sua sponte instruct on accidental stabbing is procedurally defaulted.  Petitioner withdraws this claim as it is procedurally defaulted."  (Traverse at 22.)  He also states he "withdraws this claim as it is unexhausted."  (Id. at 2.)  Because Claim 3 is exhausted and not procedurally defaulted, and because Petitioner's request to withdraw it on that basis is apparently predicated on the unsupported and erroneous representation in the Answer that the claim is unexhausted, the Court recommends rejecting Petitioner's request that the claim be withdrawn from his

Petition.  See Zichko v. Idaho, 247 F.3d 1015, 1020 (9th Cir. 2001) (federal courts are required to liberally construe pro se prisoner habeas petitions, especially with regard to the determination as to which claims are presented).

The Court will presume that the silent denial by the state supreme court was an adjudication on the merits of the federal Constitutional claim presented.  See Richter, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.")  Because the state supreme court did not articulate the reasons for denying the claim, this Court "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the Supreme Court.  Id. at 102.

By convicting Petitioner of attempted murder, the jury obviously rejected his testimony that the victim was stabbed inadvertently during their struggle over the knife.  The jurors were instructed that in order to convict Petitioner of attempted murder the prosecution was required to prove beyond a reasonable doubt that he had "the intent to kill another person."  (RT 1224.)  The state court could reasonably have found that it was unnecessary to further instruct the jury that Petitioner could not be convicted of attempted murder if the stabbing was an accident, and that the failure to instruct therefore did not violate his federal due process rights.  See Kibbe, 431 U.S. at 154 (holding that an instructional error violates federal due process where its omission "so infected the entire trial that the resulting conviction violates due process."), quoting Cupp, 414 U.S. at 147.

Even assuming Petitioner could satisfy the provisions of 28 U.S.C. § 2254(d), or show they do not apply, and assuming he could demonstrate a federal due process violation from the failure to give the instruction, any error is clearly harmless because it could not have had a substantial and injurious effect or influence on the jury's verdict.  The jury was already instructed that the prosecution bore the burden of proving Petitioner intended to

kill the victim when he stabbed her.  She testified that he told her numerous times that he was going to kill her.  (RT 360.)  He testified the stabbing was inadvertent and accidental.  (RT 1098-1100, 1100-22.)  His trial counsel argued in closing that the victim "is a vengeful woman" lying about the events, and that the forensic evidence which showed the stab wound was "fairly superficial" was consistent with the victim's statement to the police that she had not even realized she had been stabbed, and consistent with an accidental and inadvertent stabbing.  (RT 1301-04.)  In light of the jury instruction placing the burden of proof on the prosecution to show Petitioner intended to kill the victim, and the clear choice the jury was given whether to believe her story of an intentional stabbing or Petitioner's story of an accidental stabbing, it is clear that the failure to further instruct the jury on the defense of accident did not have a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637; Roy, 519 U.S. at 5.

The Court finds that Claim 3 is exhausted and is not procedurally defaulted, and recommends rejecting Petitioner's request to withdraw the claim.  The Court also finds that the adjudication of Claim 3 by the state court is objectively reasonable, that Petitioner has not demonstrated a federal due process violation, and that even if he could the alleged error is harmless.  The Court therefore recommends habeas relief be denied as to Claim 3.

### E.    Claim 4

Petitioner contends in Claim 4 that the trial court failed to conduct an adequate investigation into potential juror misconduct.  (Pet. at 32-38.)  He asserts that when a juror informed the trial judge he had received a Facebook post with what appeared to be Petitioner's photograph and a reference to the availability of a criminal background check, the trial court failed to contact the companies involved or ask the juror if he had conducted an internet search about Petitioner which may have generated the Facebook post.  (Id.)

Respondent answers that the trial court conducted an adequate inquiry when it questioned every juror and discovered no evidence that extrinsic material entered the jury room, and argues that any suggestion of juror misconduct is speculative.  (Answer at 45.)  Respondent contends that the state court denial of the claim on that basis is neither contrary

to, nor involves an unreasonable application of, clearly established federal law. (Id. at 45-49.)

The Court will look through the silent denial by the state supreme court to the last reasoned state court decision, the appellate court opinion on direct appeal, which stated:

> Butler contends the trial court did not carry out an adequate investigation of potential juror misconduct, when a juror notified the court he had received an advertisement for a criminal background check service on his Facebook page, during trial. Butler requested a mistrial and brought a motion for new trial on the same ground, which the court denied. On appeal, we examine the trial court's rulings on the issue for any abuse of discretion. (*Virgil, supra*, 51 Cal.4th at p. 1284.)

> """When a trial court is aware of possible juror misconduct, the court 'must "make whatever inquiry is reasonably necessary"' to resolve the matter." (Citation.) Although courts should promptly investigate allegations of juror misconduct "to nip the problem in the bud" (Citation), they have considerable discretion in determining how to conduct the investigation.' (Citation.) . . . The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial." (*Virgil, supra*, 51 Cal.4th at p. 1284; *People v. Ray* (1996) 13 Cal.4th 313, 343 (*Ray*).) The courts will not reach issues of prejudice unless jury misconduct is found. (*People v. Collins* (2010) 49 Cal.4th 175, 242.)

> At the outset of trial and when the case was submitted to it, the jurors were instructed in the language of CALCRIM No. 201 about their duty not to use the Internet or a dictionary in any way in connection with the case. Also, they were told under CALCRIM No. 200, in relevant part: "You must decide what the facts are. It is up to all of you, and you alone, to decide what happened, based only on the evidence that has been presented to you in this trial."

> At trial, since Butler was charged with committing the crimes while released on bail, he did not oppose informing the jury that he had a prior criminal conviction. The court took judicial notice of that prior felony conviction, and it was admitted into evidence.

> During trial, Juror No. 11 sent a note to the court stating he had received a Facebook advertisement about a criminal background check business, and it had a mug shot photo that looked somewhat like Butler. The court brought the juror into chambers to question him individually. Juror No. 11 explained

33

there were no names on the post and he could not tell who sent it to him. It appeared to be an advertisement for a company called "United States Background Checks," and it offered criminal background checks on all criminals in a given area. It was illustrated with a photo that looked like Butler. Although Juror No. 11 ignored the post, he thought it was kind of strange and was concerned enough to notify the court he had received it. When asked, he said that he could set aside any consideration of that post and make his decision based on the evidence presented in the courtroom.

Butler's attorney moved for a mistrial, on the grounds that another juror might have sent the information to Juror No. 11, or he might have been researching the case on his own. The prosecutor stated that the jury had already been told that Butler was out on bail when these incidents occurred. In response, the court called all the jurors in separately, and asked whether they had been communicating through e-mail or Facebook with each other, and they each answered no. The court found no basis to conclude any of the other jurors had communicated with Juror No. 11 in that manner, and no prejudice to Butler had arisen. The court denied the motion for mistrial.

Later, Butler filed a new trial request on the same ground, and others. He supplied additional information about the wide availability of such unsolicited criminal background check services and advertisements on the Internet. The prosecutor inquired of the arresting authorities whether they had released any mug shots of Butler to such services, and they said no. The motion was denied.

Butler contends his motion for mistrial should have been granted because the trial court did not conduct an adequate investigation into the juror's activities, thus abusing its discretion, such as when it did not accept the juror's offer to show the judge his Facebook page. Defense counsel's new trial motion attached material retrieved from the Internet about the advertised Web site, showing it listed several court index links, warrant links, and arrest links. Butler thus argues this information made it appear to Juror No. 11 that Butler "had a long and extensive criminal record, far more than the jury was told."

The jurors were made aware of the restrictions on their use of the Internet or other sources to research matters in connection with the case. Juror No. 11 conscientiously reported the matter in court, and he told the judge he could set aside any consideration of the posted advertisement and would make his decision based on the evidence presented in the courtroom.

16cv39-GPC-MDD

Only speculative concerns were raised by defense counsel. In response, the court questioned not only Juror No. 11 but also all the other jurors, and evaluated their responses. No evidence was produced to support defense counsel's contention that this juror might have done anything improper or inappropriately communicated with other jurors. There was no indication any of the jurors had violated the court's instructions or committed misconduct of any kind. (*Virgil, supra*, 51 Cal.4th at p. 1284; *Ray, supra*, 13 Cal.4th at p. 343.)

On this record, the trial court had an adequate basis to conclude that the purported misconduct did not require any further investigation. "(A) hearing is required only where the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a juror's ability to perform his duties and would justify his removal from the case." (*Ray, supra*, 13 Cal.4th at p. 343.) The trial court did not err or abuse its discretion in denying the defense's motion for mistrial or a new trial.

(Lodgment No. 7, People v. Butler, No. D063890, slip op. at 28-31.)

Petitioner has a Sixth Amendment right to trial by a jury in which the verdict is based on evidence presented at the trial. Turner v. Louisiana, 379 U.S. 466, 472-73 (1965). This right is implicated if a jury is "exposed to prejudicial extrinsic information . . . during jury deliberation." Mancuso v. Olivarez, 292 F.3d 939, 949 (9th Cir. 2002); Sassounian v. Roe, 230 F.3d 1097, 1108 (9th Cir. 2000). When extrinsic evidence is introduced in the jury room, a defendant is entitled to a new trial "if there existed a reasonable possibility that the extrinsic material could have affected the verdict." United States v. Vasquez, 597 F.2d 192, 193 (9th Cir. 1979); Gibson v. Clanon, 633 F.2d 851, 855 (9th Cir. 1980).

As the appellate court here found, an inquiry was held where all the jurors were questioned, and there is nothing in the record to suggest extrinsic evidence was presented to the jury, much less that the verdict was affected. In fact, Petitioner appears to admit as much. He contends here, as he did in state court, that the scope of the inquiry was too narrow, and with a proper investigation evidence might have been discovered to support his claim. (Pet. at 36-38; Traverse at 24-25.) Thus, the appellate court properly viewed this claim as speculative. In any case, the juror who received and reported the Facebook

16cv39-GPC-MDD

post said he could set the post aside and make his decision based on the evidence presented at trial.  (RT 967.)  All the other jurors were questioned and denied being exposed to the post.  (RT 973-80.)  This Court must defer to the trial judge's determination that the only juror who was exposed to the post was able to remain impartial.  See Miller v. Fenton, 474 U.S. 104, 114 (1985) (holding that a state trial judge is in a far superior position to assess juror bias than federal habeas judges); see also Austad v. Risley, 761 F.2d 1348, 1350 (9th Cir. 1985) ("The Supreme Court has clearly established that the determination of a juror's partiality or bias is a factual determination to which section 2254(d)'s presumption of correctness applies."), citing Patton v. Yount, 467 U.S. 1025, 1036 (1984).  Accordingly, the Court finds that Petitioner has failed to demonstrate that the state court adjudication of this claim is contrary to, or involves an unreasonable application of, clearly established federal law, or is based on an unreasonable determination of the facts.

Even if Petitioner could demonstrate that extrinsic evidence was introduced into the jury deliberations, or that the state court's adjudication of the claim is objectively unreasonable, habeas relief is not available unless he can also demonstrate that the extrinsic evidence had a substantial or injurious effect or influence on the jury's verdict.  Sassounian, 230 F.3d at 1108 (holding that harmless error standard of Brecht applies to claims of jury's consideration of extraneous evidence).  Evidence was presented at trial that Petitioner had a criminal record.  Jessica Butler, Petitioner's ex-wife, testified that Petitioner slapped, pulled, pushed, choked, and tried to punch her on one occasion, which led to his arrest and conviction for domestic violence.  (RT 610-15.)  She testified that Petitioner was later arrested for violating a restraining order arising from those charges.  (RT 614-18.)  Additional evidence was presented showing that when the offenses in this case were committed Petitioner was on bail awaiting sentencing for a felony conviction of attempting to dissuade a witness (the victim in this case), and for violating a restraining order which precluded him from having contact with the victim in this case.  (RT 885-89, 1026-27.)  Thus, in light of the evidence presented at trial that Petitioner did have a criminal record, and the assurance from the only juror to be exposed to a Facebook post which indicated

36

Petitioner <u>may have</u> a criminal record, that he could set the information aside and decide the case on the evidence presented at trial, it is clear that the alleged error here (failure to further investigate the origin of the Facebook post in order to determine if it was generated by the juror), did not have a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637; <u>Roy</u>, 519 U.S. at 5.

The Court finds that the adjudication of Claim 4 by the state court is objectively reasonable, that Petitioner has not demonstrated a federal due process violation arising from the alleged error, and that any error is clearly harmless. The Court recommends habeas relief be denied as to Claim 4.

## F.    Claim 5

Petitioner alleges in his final claim that he was deprived of his federal constitutional right to the effective assistance of counsel when his trial counsel failed to object to numerous instances of misconduct during the prosecutor's closing argument. (Pet. at 39-43.) He contends the prosecutor: (a) improperly commented on Petitioner's right to be present at trial and testify; (b) attacked the defense counsel's integrity; (c) expressed a personal opinion of Petitioner's guilt; (d) vouched for witnesses; (e) and "made a Golden Rule argument coupled with a law and order appeal." (<u>Id.</u>) Respondent answers that the denial of this claim by the state court, on the basis that the prosecutor made no objectionable comments and therefore the failure of defense counsel to object did not constitute ineffective assistance, is objectively reasonable. (Answer at 50-60.)

Petitioner presented this claim to the state superior, appellate and supreme courts in consecutive habeas petitions. (Lodgment Nos. 10, 12, 14-15.) The superior court denied the petition, stating:

> Petitioner has not provided any documentary support to show that the prosecution actually made the statements and that if it did, that counsel failed to object to the statements. There is no record from the trial court to confirm that the statements were made and to show the context of those statements. Context is essential. The statements read as if they were part of the prosecution's closing arguments. If this was the case they would have been entirely appropriate for the prosecution to make. "(T)he prosecution has broad

16cv39-GPC-MDD

discretion to state its views regarding which reasonable inferences may or may not be drawn from the evidence. (Citation.)  Arguments by the prosecutor that otherwise might be deemed improper do not constitute misconduct if they fall within the proper limits of rebuttal to the arguments of defense counsel. (Citation.)" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1026, as modified (Aug. 15, 2001).)  Petitioner has not made a basic showing that the statements, if in fact made by the prosecution, were made in a context and manner which rendered them objectionable such that counsel's failure to object was error.

Even if petitioner has shown the prosecution made the statements and counsel failed to object, there is no guarantee the court would have been required to issue curative instructions.

Indeed, on appeal the court found the trial court did not have a sua sponte duty to instruct on petitioner's defenses of consent, self-defense, and/or accident.  Therefore, it seems objections by trial counsel to prosecution arguments on these grounds would have been futile and would not have resulted in curative instructions.

In sum, petitioner has not shown that counsel failed to act as counsel guaranteed by the Sixth Amendment and that this failure resulted in prejudice to petitioner.

(Lodgment No.11, In re Butler, HC21948, order at 4-5 (Cal.Sup.Ct. Apr. 20, 2015).)

Petitioner presented the same claim to the appellate court, again without attaching the trial transcripts which contained the allegedly objectionable remarks of the prosecutor. (Lodgment No. 12.)  The appellate court denied the petition, first remarking that it could be denied on the basis that it is untimely and that the trial transcripts were not attached, and then stating:

Butler's claim also fails on the merits.  None of the various remarks by the prosecutor during closing argument Butler quotes in his petition amounted to misconduct.  The prosecutor's remarks that defense counsel's argument the victim consented to oral copulation and sodomy was "absolutely preposterous," that the defense theory was "completely unreasonable," and that defense counsel "glossed over" both the law and Butler's testimony, did not denigrate counsel personally.  Those remarks, which were "'aimed solely at the persuasive force of defense counsel's . . . argument(s), and not at counsel personally'" (*People v. Hajek* (2014) 58 Cal.4th 1144, 1230), "fell well within

38

the latitude allowed in commenting upon deficiencies in opposing counsel's tactics" (*People v. Redd* (2010) 48 Cal.4th 691, 736). By arguing that the victim did not consent to oral copulation and sodomy, that Butler did not act in self-defense, that the victim's testimony was credible based on the evidence introduced at trial, and that the victim was vulnerable and endured a "nightmare," the prosecutor did not impermissibly express personal opinions on Butler's guilt, vouch for the victim's credibility, or appeal to the jurors' sympathy. The prosecutor was entitled to attack the sincerity of Butler's and his counsel's assertions regarding consent and self-defense. (*People v. Shazier* (2014) 60 Cal.4th 109, 146.) The prosecutor also was entitled to "comment upon the credibility of witnesses based on facts contained in the record, and any reasonable inferences that can be drawn from them." (*People v. Martinez* (2010) 47 Cal.4th 911, 958.) Further, the prosecutor did not impermissibly ask jurors 'to step into the victim's shoes and imagine . . . her suffering," but instead permissibly "identif(ied) traits that made the victim particularly vulnerable to attack where such facts bear on the charged crimes and are not otherwise inadmissible on their face." (*People v. Millwee* (1998) 18 Cal.4th 96, 137.) The prosecutor's remarks were not objectionable, and any objection by Butler's trial counsel properly would have been overruled. "Failure to make meritless objections cannot be the basis of an ineffective assistance of counsel claim." (*People v. Sanamiego* (2009) 172 Cal.App.4th 1148, 1170.)

(Lodgment No. 13, <u>In re Butler</u>, No. D068111 (Cal.Ct.App. June 15, 2015).)

Petitioner thereafter raised the same claim, this time accompanied by the trial transcripts of the prosecutor's closing argument, in a habeas petition in the state supreme court. (Lodgment Nos. 14-15.) That petition was denied with an order which stated: "Petition for writ of habeas corpus denied." (Lodgment No. 16.)

"Before we can apply AEDPA's standards, we must identify the state court decision that is appropriate for our review. When more than one state court has adjudicated a claim, we analyze the last reasoned decision." <u>Barker v. Fleming</u>, 423 F.3d 1085, 1091-92 (9th Cir. 2005). Here, the last reasoned decision is the appellate court opinion. Although the appellate court remarked that it could deny the claim on the basis that Petitioner did not attach the relevant trial transcripts, it went on to address the merits of the claims. Because Petitioner attached the transcripts to his subsequent state supreme court habeas petition, there is nothing in the record to rebut the presumption that the state supreme court adopted

the reasoning of the appellate court with respect to the denial of the claim on its merits, rather than on the procedural defect of failing to attach the transcripts or the passing reference to its option to deny the petition on the basis of untimeliness.  Ylst, 501 U.S. at 805; Barker, 423 F.3d at 1091-92.

For ineffective assistance of counsel to provide a basis for habeas relief, Petitioner must show that counsel's performance was deficient.  Strickland v. Washington, 466 U.S. 668, 687 (1984).  "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Id.  Petitioner must also show that counsel's deficient performance prejudiced the defense, which requires showing that "counsel's errors were so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable."  Id.  To show prejudice, Petitioner need only demonstrate a reasonable probability that the result of the proceeding would have been different absent the error.  Id. at 694.  A reasonable probability in this context is "a probability sufficient to undermine confidence in the outcome."  Id.  Petitioner must establish both deficient performance and prejudice in order to establish ineffective assistance of counsel.  Id. at 687.  "The standards created by Strickland and section 2254(d) are both 'highly deferential' and when the two apply in tandem, review is 'doubly' so." Richter, 562 U.S. at 105 (citations omitted).  These standards are "difficult to meet" and "demands that state court decisions be given the benefit of the doubt." Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

Clearly established federal law provides that prosecutorial misconduct, in order to constitute a federal due process violation, must be "'of sufficient significance to result in the denial of the defendant's right to a fair trial.'"  Greer v. Miller, 483 U.S. 756, 765 (1987), quoting United States v. Bagley, 473 U.S. 667, 676 (1985).  The misconduct must be reviewed in the context of the entire trial.  Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).  Even where misconduct rises to the level of a federal constitutional error, federal habeas relief is not available if the error was harmless.  Fields v. Woodford, 309 F.3d 1095, 1109 (9th Cir. 2002), citing Brecht, 507 U.S. at 637.

40

Petitioner first objects to the prosecutor's comment that he tailored his testimony when she said: "As we sit here in this room today, it's hard to imagine the gentleman who testified to you from the stand yesterday, the clean, dressed, well-spoken intelligent guy with an explanation for everything, based on the fact that he is the single witness in this case who got to sit here and listen to all the evidence against him before he ever raised his hand and took an oath to tell the truth.  He knew every single piece of evidence.  And before he ever had to utter to you an explanation, he was able to tailor it to try to explain away the overwhelming evidence, the overwhelming physical injuries that he inflicted to Danielle D. in this case."  (RT 1245.)  The state court denial of this claim, on the basis the remark was not objectionable and therefore counsel was not deficient in failing to object, did not constitute an objectively unreasonable application of clearly established federal law.  See Portuondo v. Agard, 529 U.S. 61, 64-65 (2000) (holding that prosecutor's comment in summation that the defendant had the opportunity to hear the testimony of all the other witnesses and tailor his testimony accordingly did not constitute error.); Pinholster, 563 U.S. 181; Richter, 562 U.S. at 105; Strickland, 466 U.S. at 687, 694.

Petitioner next contends the prosecutor expressed her personal opinion of his guilt and vouched for witnesses.  He objects to the prosecutor's expression of her personal opinion through her comments: "Now, he selected Danielle for specifically one reason: He thought he could get away with what he did." (RT 1248); "I think his right to have a relationship with Danielle D. ended when he forcefully sodomized her in the back of the car, when he ripped her anus open to the point where she was oozing blood, when he stuck a knife in her back when she was crying in terror, running into the arms of a complete stranger, begging for help." (RT 1249); "And when I take you through the evidence in this case, I suggest to you that the defense's theory is completely unreasonable." (RT 1255); "He did not act in self-defense in this case.  His actions are not reasonable in any way." (RT 1354); and "I know it's been a long day, but it is important in this case to talk about the reasonableness of the defendant's version and the unreasonableness." (RT 1355.) Petitioner also argues the prosecutor vouched for witnesses when she said: "Jessica Butler

41

[Petitioner's ex-wife] is a totally credible witness." (RT 1327); "but in this case he has to disarm this young, small girl to the point where he breaks her wrist and stabs her in the back.  Is that the kind of martial arts training he got?  That's the kind of force he needs to use in order to get a knife away from somebody Danielle's size?  I don't think so, because that's not what happened." (RT 1329); "But what I can tell you is this: She was being forcefully taken down to the park." (RT 1329); and "She was honest with you about her shortcomings.  She is not a liar.  She was honest about the fact that she had had consensual vaginal sex with him that morning.  She never hid that fact from anyone.  She never told anyone that didn't happen.  She didn't have to volunteer that information.  If she was trying to make herself look better, she absolutely didn't need to be forthcoming about that information, but she was, because she was telling the truth."  (RT 1251.)

It is improper for a prosecutor to express her personal opinion of the defendant's guilt, United States v. Younger, 398 F.3d 1179, 1190 (9th Cir. 2005), or to place the prestige of the government behind a witness by a personal assurance the witness is telling the truth.  United States v. Molina, 934 F.2d 1440, 1444 (9th Cir. 1991).  Vouching is especially problematic where the credibility of the witnesses is crucial.  Id. at 1445. However, the appellate court correctly found that these remarks fit within the reasonable latitude prosecutors have to argue that one of the two sides are lying.  Id.; see also Lawn v. United States, 355 U.S. 339, 359 n.15 (1958) (vouching does not occur where the comments are invited by defense counsel's attack on credibility, and where the prosecutor does not say or insinuate that her statement was based on personal knowledge or anything other than witness testimony).  The trial judge reminded the jurors immediately before closing arguments began of their previous instruction that the attorney's comments did not constitute evidence, but were presented merely to "outline for you his or her interpretation as to what the evidence has shown."  (RT 1243.)  Those instructions mitigated any possible prejudice from the statements.  Darden v. Wainwright, 477 U.S. 168, 182 (1986) (holding that instructing the jury "that their decision was to be made on the basis of the evidence alone, and that the augments of counsel were not evidence" mitigated against unfairness,

42

as did the fact that the prosecutor did not manipulate or misstate the evidence.)  It was objectively reasonable for the state court to find defense counsel was not ineffective for failing to object.  Richter, 562 U.S. at 105; Strickland, 466 U.S. at 687, 694.

Petitioner next argues that the prosecutor attacked the integrity of defense counsel when she began her rebuttal closing argument by saying: "I want to start by talking about the fact that defense counsel just indicated, you know, 'I'm not here –' and his words, 'I'm not here to pick apart Danielle D.  I'm not here, but it's my job, however, to point out these inconsistencies.'  Ladies and gentlemen, I ask you how much time did he just spend talking about Danielle D.'s testimony?  The bulk of his argument.  He glossed over the law.  He glossed over his client's testimony. . . . But when you sit here and you are given two different versions of evidence, two different versions of the truth of what happened, and the defense attorney stands up and glosses over his own client's testimony, you as a jury are called upon to use your common sense and to wonder how much sense that makes to you.  How much sense does it make to quickly go over his client's explanation for how all these events happened?  Not to pick apart what his client said, but to gloss over it, to gloss over the law, and then spend the bulk of the argument going into every little detailed statement Danielle made, then to tell you as a jury if the most traumatic event of your life ever happened, you would remember everything, you would remember every footstep, you would remember every breath?"  (RT 1324-25.)

The Ninth Circuit has found that it is improper for the prosecutor to attack defense counsel's integrity without evidence to support the attack, Bruno v. Rushen, 721 F.2d 1193, 1195 (9th Cir. 1983), or to attack defense counsel's legitimate trial tactics, United States v. Frederick, 78 F.3d 1370, 1379-80 (9th Cir. 1996).  The prosecutor is, however, "free to voice doubt about the veracity of a defendant's story [since] the inference that one side is lying is unavoidable." Dubria v. Smith, 224 F.3d 995, 1004 (9th Cir. 2000); see also United States v. Sayetsitty, 107 F.3d 1405, 1409 (9th Cir. 1997) ("Criticism of defense theories and tactics is a proper subject of closing argument.")

/ / /

43

16cv39-GPC-MDD

Assuming Petitioner has demonstrated that the prosecutor's comments were objectionable, clearly established federal law provides that improper comments violate federal due process only whether they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden, 477 U.S. at 181-83.  Because the jury was provided with a stark choice between the versions of events given by the victim and Petitioner, comments by the prosecutor challenging defense counsel's strategy of focusing on inconsistencies in the victim's statement rather than his own client's testimony or the law, did not infect the trial with unfairness.  In addition, Petitioner has not shown that defense counsel's failure to object to the prosecutor's statements in this regard was not a legitimate trial strategy designed to avoid drawing further attention to the weaknesses of his defense strategy.  Neither was Petitioner prejudiced by the failure to object because any curative instruction would be repetitive of the instructions the jury were given that comments of counsel are not evidence and merely reflect their personal opinions.  In light of the double deference owed to the state court determination that defense counsel was not deficient in failing to object to these comments, Petitioner has not demonstrated that the state court adjudication is objectively unreasonable. Pinholster, 563 U.S. at 1398; Richter, 562 U.S. at 105; Strickland, 466 U.S. at 687, 694.

Finally, Petitioner contends the prosecutor improperly invoked the golden rule and appealed to law and order when she said:  "At the beginning of trial I told you as jurors that you had the power to end the nightmare for Danielle D."  (Pet. at 42.)  Placing the comments in context, the prosecutor continued:  "And for one year she has waited, ladies and gentlemen.  In this case he's guilty of each and every charge and allegation.  He is used to being in power and control.  And the power and control is in your hands collectively, together, as jurors.  You can take your time if you need to, but in this case you need to do justice because it is the right thing and the only consistent and inescapable truth in this case is that he is guilty of each and every one of these crimes."  (RT 1363-64.)

It is misconduct for a prosecutor to invite the jurors to put themselves in the place of the victim because it "inappropriately obscure[s] the fact that his role is to vindicate the

44

1   public's interest in punishing crime, not to exact revenge on behalf of an individual victim."

2   Drayden v. White, 232 F.3d 704, 712-13 (9th Cir. 2000).  Here, however, as in Darden, the

3   prosecutor did not manipulate or misstate evidence, and the jurors were instructed that the

4   comments of counsel were not evidence but merely opinion.  Darden, 477 U.S. at 181-82.

5   When viewed in the context of the entire trial as it must be, Donnelly, 416 U.S. at 643, the

6   prosecutor was commenting on the strength of the evidence against Petitioner and the

7   severity of the crime, not appealing for revenge.  Nevertheless, even if the comments went

8   further than asking the jury to vindicate the public's interest in punishing crime, in light of

9   the strength of the evidence against Petitioner, including his past history of similar

10  domestic violence, it is clear the comments did not "so infect[] the trial with unfairness as

11  to make the resulting conviction a denial of due process." Darden, 477 U.S. at 182 (finding

12  no due process violation where the weight of the evidence was against the petitioner, the

13  prosecutor's remarks were invited by defense argument and did not misstate or manipulate

14  the evidence, and were cured by the instructions).

15          The Court finds that Petitioner has failed to demonstrate he was prejudiced by his

16  counsel's failure to object to these comments because they did not violate due process, and

17  because an objection, had it been made and sustained, would have resulted in a curative

18  instruction identical to those already given, namely, informing the jury that the argument

19  of counsel is not evidence but merely an expression of their opinion as to what the evidence

20  shows.  See Strickland, 466 U.S. at 694 (holding that prejudice requires showing "a

21  probability sufficient to undermine confidence in the outcome."); Richter, 562 U.S. at 105

22  ("The standards created by Strickland and section 2254(d) are both 'highly deferential' and

23  when the two apply in tandem, review is 'doubly' so.") (citations omitted).  The Court finds

24  it was therefore objectively reasonable for the state court to find that defense counsel was

25  not ineffective for failing to object to these comments by the prosecutor.  Richter, 562 U.S.

26  at 105; Strickland, 466 U.S. at 694; see also Pinholster, 563 U.S. at 181 (holding that those

27  standards are "difficult to meet" and "demands that state court decisions be given the

28  benefit of the doubt.")

The state court adjudication of Claim 5, on the basis that defense counsel was not ineffective for failing to object to the prosecutor's remarks, is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  The Court recommends habeas relief be denied as to Claim 5.

## IV.   **CONCLUSION**

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered denying the Petition.

**IT IS ORDERED** that no later than **November 1, 2016**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **November 11, 2016.**  The parties are advised that failure to file objections with the specified time may waive the right to raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated:   October 11, 2016

Hon. Mitchell D. Dembin
United States Magistrate Judge

46

16cv39-GPC-MDD