UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

DARIUS BUTLER

                    Petitioner,

vs.

W. L. MONTGOMERY, et al.,

                    Respondents.

Case No. 3:16-cv-00039-GPC-MDD

**ORDER:**

**(1) ADOPTING REPORT AND RECOMMNEDATION DENYING PETITION FOR WRIT OF HABEAS CORPUS; AND**

**(2) DENYING A CERTIFICATE OF APPEALABILITY**

On January 7, 2016, Petitioner Darius Butler ("Petitioner"), a state prisoner proceeding pro se and in forma pauperis, filed a Petition for Writ of Habeas Corpus ("Petition") in federal court pursuant to 28 U.S.C. § 2254. (Dkt. No. 1.) He challenges his state court convictions in San Diego Superior Court Case No. SDC237121 for attempted

murder, kidnapping, and forcible sodomy and oral copulation, for which he is sentenced to 50 years-to-life plus 19 years in state prison. (Dkt. No. 1, Pet. at 1-2, 15[1].)

On October 11, 2016, pursuant to 28 U.S.C. § 636(b)(1), Magistrate Judge Mitchell D. Dembin issued a Report and Recommendation ("Report") that this Court deny the Petition. (Dkt. No. 21.) Petitioner did not file an objection.

After careful consideration of the pleadings and relevant exhibits submitted by the parties, the Court finds Magistrate Judge Dembin's Report to be thorough, complete, and an accurate analysis of the legal issues presented in the Petition. For the reasons explained below, this Court: (1) **ADOPTS** the Magistrate Judge's Report in its entirety denying the petition for writ of habeas corpus, and (2) **DENIES** a certificate of appealability.

## BACKGROUND

### A. Procedural Background

On March 26, 2012, the San Diego County District Attorney's Office filed a third amended felony complaint charging Petitioner with kidnapping for the purpose of committing sodomy and/or oral copulation in violation of California Penal Code ("Penal Code") section 209(b)(1) (Count 1), forcible oral copulation in violation of Penal Code section 288(c)(2)(A) (Count 2), sodomy by use of force in violation of Penal Code section 288(c)(2)(A) (Count 3), and attempted murder in violation of Penal Code section 187(a) (Count 4). (Dkt. No. 13-7, Lodgment No. 2, Clerk's Tr. ["CT"] at 21-25[2].) As to all counts the complaint alleged that Petitioner used a deadly weapon (a knife) and committed the offenses while he was released on bail. (Id.) As to counts 2-4 the complaint alleged he inflicted great bodily injury on the victim, and as to counts 2 and 3 it alleged he substantially increased the risk of harm by kidnapping the victim. (Id.)

---

[1] Page numbers are based on the CM/ECF pagination.
[2] Page numbers of the state court record are based on the state court's pagination.

Following a jury trial, Petitioner was found guilty on all counts. (Dkt. No. 13-9, Lodgment No. 2, CT at 371-80.) The jury found true the allegations that he was released on bail at the time of the offenses, that he substantially increased the risk of harm to the victim by kidnapping her with respect to counts 2 and 3, that he personally inflicted great bodily injury during the commission of counts 3 and 4, and that he personally used a deadly weapon during the commission of count 4. (Id.) The jury returned not true findings that he used a deadly weapon during the commission of counts 1-3 and inflicted great bodily injury during the commission of count 2. (Id.) A new trial motion argued, inter alia, that the investigation into juror misconduct was inadequate. (Dkt. No. 13-8, Lodgment No. 2, CT at 184-208.) That motion was denied and Petitioner was sentenced to 50 years-to-life plus 19 years in state prison. (Dkt. No. 13-9, Lodgment No. 2, CT at 383-85.)

Petitioner raises five challenges to his state court conviction. (Dkt. No. 1, Pet.) Petitioner claims his due process rights were violated by the trial court's failure to sua sponte instruct the jury on attempted voluntary manslaughter as a lesser included offense of attempted murder (Claim 1), on the Petitioner's reasonable but mistaken belief the victim consented (Claim 2), and on the defense of accident (Claim 3). (Id. at 17-31.) Petitioner also claims the trial court failed to adequately investigate potential juror misconduct (Claim 4), and that he received ineffective assistance of counsel due to his trial counsel's failure to object to comments made by the prosecutor during closing arguments (Claim 5). (Id. at 32-46.)

Petitioner appealed his conviction with the California Court of Appeal, raising Claims 1-4 presented here. (Dkt. Nos. 13-10, Lodgment No. 3.) While the appeal was pending in the appellate court, Petitioner's appellate counsel withdrew Claim 3 on the basis that the claim "has been resolved by the California Supreme Court." (Dkt. No. 13-11, Lodgment No. 4.) The state appellate court affirmed the convictions in a written opinion. (Dkt. No. 13-14, Lodgment No. 7.) Petitioner then filed a petition for review in the California Supreme Court presenting Claims 1-4 raised here. (Dkt. No. 13-15, Lodgment No. 8.) Petitioner included the previously withdrawn Claim 3 and requested a remand for

the appellate court to consider the claim. (Id. at 26.) On October 16, 2014, the California Supreme Court summarily denied the petition for review in an order which stated: "The petition for review is denied." (Dkt. No. 13-16, Lodgment No. 9.) Petitioner thereafter filed habeas petitions in the state superior, appellate and supreme courts raising Claim 5. (Dkt. Nos. 13-17, 13-19, 13-21, 13-22, Lodgment Nos. 10, 12, 14, 15.) The claim was denied on the merits by the superior and appellate courts, and summarily denied without citation of authority by the state supreme court. (Dkt. Nos. 13-18, 13-20, 13-23, Lodgment Nos. 11, 13, 16.)

On January 7, 2016, Petitioner filed the present Petition, alleging that his state court conviction violated his federal constitutional rights on the basis of Claims 1-5. (Dkt. No. 1, Pet.) Respondent filed an Answer and lodged the state court records on March 7, 2016, arguing habeas relief is unavailable because (a) Claim 1 and 2 do not present a federal question, but even if they do the decisions of the state courts are entitled to deference because the adjudication of those claims is neither contrary to nor an unreasonable application of Supreme Court precedence; (b) Claim 3 is unexhausted, procedurally defaulted and does not present a federal question, but can be denied irrespective of the failure to exhaust because it is without merit; and (c) the state court denials of Claim 4 and Claim 5 are neither contrary to nor an unreasonable application of Supreme Court precedence. (Dkt. No. 12; 12-1 at 11-49; 13.) On June 14, 2016, Petitioner filed a Traverse in which he admits Claim 3 is unexhausted and procedurally defaulted and requests it be withdrawn from his Petition, but argues that his remaining claims have merit. (Dkt. No. 20, Traverse at 2, 13-37.)

**B. Factual Background**

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1); see also Parle v. Fraley, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness). The following facts are

taken from the unpublished California Court of Appeal opinion, affirming Petitioner's conviction. (Dkt. No. 13-14, Lodgment No. 7, <u>People v. Butler</u>, No. D063890 (Cal. App. 4th July 22, 2014).)

## A. Incidents

In 2010, Butler was in his early 20's and a tall, strong ex-Marine when he met 20-year-old Danielle (5'3" tall). They had a harmonious romantic and sexual relationship for about four months. He gave her a knife and taught her how to use it. They started to argue and physically fight about their relationship and mutual infidelity and periodically broke up, but they continued their sexual relationship off and on for about a year.

These charges arose out of an October 2011 incident involving Danielle's overnight visit to his apartment, involving drinking and consensual sex, and then the next day of being together drinking, arguing, and eventually, fighting in which she was badly injured. Additionally, the prosecution presented evidence about several incidents of Butler's earlier uncharged violent criminal conduct toward Danielle, occurring from June through September 2011. In June 2011, they argued by phone about infidelity and a sexually transmitted disease. Butler went to Danielle's home, grabbed her around the neck, threw her into a wall and door, then choked her and pushed her to the ground. Danielle's friend, Samantha P., was present and called 911, reporting that Butler was threatening to cut Danielle's throat with his knife. After less than 10 minutes, Butler handed the knife to Danielle and left. Butler was arrested and his knife confiscated from Danielle. Butler told police that he gave the knife to Danielle because he was afraid something would happen. Butler did not have any explanation for police about the reasons for the June 2011 fight.

After the June 2011 incident, the court issued a criminal protective order dated July 18, 2011 that prohibited Butler from contacting Danielle. However, they continued to call, text and see each other occasionally.

In August 2011, Butler and Danielle were driving when he angrily hit her in the throat a few times, then stopped, pulled her out of the car, and kicked her in the face and stomach. She did not go home to her parents until the next day because her injuries looked so bad. She then called police and a report was taken.

In September 2011, Butler pled guilty to dissuading a witness from reporting a crime and was released on bail, pending sentencing in November 2011. Later in September 2011, Danielle sent him some nude photographs of herself and a female friend in sexual positions together, but she then asked for the pictures back. Butler refused and told her he was going to post the photographs on the Internet. Danielle threatened to file a police report.

On September 30, 2011, Butler sent text messages to Danielle and asked her to call him, but she did not do so. She and a friend were driving away from her home when they saw Butler in his car waiting around, and he then followed her car, honked his horn and interfered with her driving, trying to get her car to veer off the road. After a few days, Danielle made a police report about the incident.

In mid-October, Danielle sent text messages to Butler, and on October 15, 2011, they had a two-hour phone conversation. They started arguing about their relationship and infidelity, and Butler wanted to come to her house, which her parents had forbidden. She wanted to keep him away from her friends and family and agreed to come to his apartment, so she could say goodbye and have "closure." Bringing her overnight bag, Danielle drove her car to Butler's apartment around 2 a.m. For about two hours, they drank wine, talked, had consensual conventional sex, then fell asleep.

In the morning, Danielle told Butler she was going to church, but he discouraged her from doing so, and they spent the day together, eating and drinking numerous cocktails and beers at a few bars near his apartment, where they walked. He carried a knife in his pocket, as he usually did. They went to a sushi bar for dinner, but Danielle because nauseated and went to the restroom. According to her testimony, when she returned, Butler looked angrily at her and started asking her about her unfaithfulness, and telling her she had messed with the wrong person and was not going to have a good night. When he slapped her face, Danielle did not want to talk to the employees at the restaurant or make a scene, so they left, walking through a dark alley.

In the alley, Butler hit and kicked her, knocked her to the ground, and kicked her some more. When he pulled her up, she could not move her arm. Butler told her he was going to kill her and punched her in the stomach and beat her head into the ground. For about an hour, Butler dragged and pulled Danielle back toward his house, while he continued to hurt her. When they reached her parked car, Butler shoved her into the passenger seat and got in the driver's seat. She did not run away because she was afraid he would catch

her and hurt her again. He unzipped his pants, showing he had an erection, and pulled Danielle's head down to his penis while he told her to orally copulate him. According to Danielle, he was holding the knife on his lap and hitting her. She told him to stop, but he continued to threaten her and force his penis into her mouth while he drove. After they traveled this way for about a half-mile, Butler parked his car, took his clothes off, pulled Danielle by the hair into the back seat, and ripped off her clothes. Danielle was on her hand and knees while he penetrated her anus several times with his penis, which hurt her. When he finished, he got dressed and started driving toward a park at the end of the street, saying he was going to kill her there where it was dark and quiet and she believed him. He parked the car and started to pull her out by the hair. As they struggled and she screamed, his knife went into her back about an inch and she started bleeding.

Butler then started walking Danielle toward the park, and they noticed that a neighbor near the park and others were watching. Butler decided to go back to the car, Danielle got into the passenger seat, and he closed the door and walked around to the driver's seat. At that point, Danielle opened her door, jumped out and ran toward the neighbor's house and bolted into it, crying, "He is going to kill me." The neighbor, Anthony Lawrence, shut and locked the door, and had her sit down because she seemed to be hyperventilating. Next, Danielle ran up the stairs to another room and collapsed, telling Lawrence and his roommate that Butler had raped, beaten and threatened her. Lawrence called 911, telling the dispatcher that a young woman, who was a stranger to him, had run into his house to get away from a man who had been "dragging" her back to their car, while apparently using his knife to control her. Before police responded, Butler knocked on the door and called for Danielle, but they did not answer and he left.

The responding police officer testified he found Danielle on a bed in Lawrence's house, in a bruised and hysterical condition. She had a puncture wound in the center of her back and was bleeding all over the bed. Blood was found on the sidewalk outside the house. While being taken to a hospital, Danielle was crying and in pain. She described to the responding officer and a detective how Butler attacked, threatened and forced her into sex acts. She also reported she had consumed three beers and a gin and tonic that evening. She gave a similar account to a deputy district attorney and the investigating detective the next day, and later at Butler's preliminary hearing.

At the hospital, Danielle was examined by medical personnel, including an orthopedic surgeon and a sexual assault response team (SART) nurse.

Danielle's injuries included a fractured wrist with significant displacement, caused by blunt force trauma, and a lacerated liver. She was very "banged up" and in pain, with bruising and soreness in her face, back and anus, where she was bleeding. The nurse could not fully examine Danielle's anal area, due to the pain, but the nurse saw one laceration there. The nurse's findings about injuries were consistent with Danielle's description of the incident, but the nurse could not rule out consensual sex as a causative factor.

Butler was arrested a few days later, at his new girlfriend's home in Oceanside. His vehicle was found in her garage.

### B. Trial Proceedings

At trial, Lawrence testified he heard a commotion outside his house at about 7:30 p.m. that day, so he looked outside and saw Butler "shepherding" Danielle by the arm back to a white car. She looked like she had been crying. After Danielle got in the car, Lawrence saw her jump out and run towards his house, screaming that her boyfriend was going to kill her, and saying she couldn't move her arm. He didn't think she seemed intoxicated.

The prosecution presented evidence about several incidents of Butler's earlier uncharged criminal violent conduct toward his ex-wife Jessica Butler, who was then also in the Marine Corps. They were married in January 2007 and had a violent argument in October 2007. When Butler slapped, pushed, and choked his then-wife, she lost consciousness. As a result, Butler pleaded guilty to a crime of domestic violence, and a criminal protective order prohibited him from contacting her. However, they continued to have a relationship.

Another violent incident took place between them in May 2008, when he threatened and chased Jessica, then seven months pregnant, and she jumped off a second-story balcony to get away from him. He ran after her and punched or kicked her, knocking her down. Butler served time in jail and in 2009, was dishonorably discharged from the Marine Corps for domestic violence.

At trial, the jury heard testimony from a domestic violence expert who explained the usual dynamics of such a relationship, such as why an abused woman might continue to return to her abuser. [Footnote: Rebuttal evidence was presented about an attack by Butler on a couple in November 2008, but it need not be summarized here.]

Butler testified in his defense, first explaining that in the Marines, he had received special training in martial arts and was a black belt instructor. He was a weapons enthusiast and usually carried a knife. During their relationship, he gave a knife to Danielle and taught her how to use it. However, he did not get his own knife back after he gave it to Danielle after the June 2011 incident.

Butler acknowledged that both he and Danielle disrespected each other when they cheated on each other, during their relationship of one and a half years. By June 2011, when they had the fight at her home, they had been together for about a year and she was angry that he had relationships with other women. That day, she told him she was unfaithful to him, using a racial slur. Butler said he pushed her against the wall, she apologized, and they both calmed down. He did not open his knife that day.

During the incident in August 2011, he said Danielle got upset when he lost the keys to a car that she was driving, but they did not fight about it. When he was arrested a few days later for assaulting Danielle, he denied it. When Danielle sent him nude photographs of herself and a female friend in September, Butler refused to give them back. He was upset about the August arrest and claimed that Danielle was threatening to lie to the police and file a false police report. He testified that he did not follow Danielle in his car on September 30. By then, he had a new girlfriend and had moved on from Danielle and past relationships.

Butler testified that Danielle texted him "out of the blue" on October 13. Although he was already in a new relationship and had decided to move on, he still had feelings for Danielle. Two days later, he and Danielle talked on the phone for about two hours. When he told Danielle about his new girlfriend, who was out of town, Danielle got upset that he had replaced her and she came to his apartment around 2:00 or 3:00 a.m. They got along well and had consensual sex. Danielle told him there was nobody like him among other men, and she wanted to "wait" for him until after his upcoming sentence was over (for dissuading a witness).

The next day they were happy to be together and went to a restaurant and several bars, and both of them had a number of drinks (beer and gin and tonics). They were both drunk but able to talk about and plan on having anal sex at the park, which they had done before a few times. At the restaurant where they went to eat dinner, they discussed infidelity, but without arguing about it. Butler understood that he and Danielle had cheated on each other,

but testified that this did not upset him, because that was the type of women that he dated, so he wasn't surprised.

Butler testified that when he and Danielle left the restaurant, they strolled back toward his apartment, taking in the night air, although they stumbled a bit because they were drunk. They were still planning to drive together in Danielle's car to the nearby park to have sex, because Butler's roommate might be at home and he did not approve of their relationship. When they got to the car, Danielle voluntarily performed oral sex on him. They found that the park was barricaded so they parked the car nearby, and Danielle went into the back seat and undressed. They continued the oral copulation and then they moved around to have anal sex, while she encouraged him. Butler testified that throughout the episode, he did not beat, punch, kick or push Danielle down, and he did not have his knife with him.

Afterwards, they got dressed and moved around in the car. Danielle didn't want to go home, even though she knew Butler's girlfriend was coming back to him the next day. Butler and Danielle were both upset and frustrated about the way the day was going, and they argued about the new girlfriend. Butler heard a click, which he recognized as the sound of Danielle's knife opening, and she lunged at him with the knife. He was surprised and afraid because he had taught Danielle where to stab a person to kill him, and he thought she would do so. As he had been trained to do, he lunged at Danielle to disarm her, reaching for her wrist and hand and using his head and weight to pin her into the back seat. He bent and twisted her wrist, probably breaking it, then hit her in the chest a few times as "softening blows," for distraction. When he pulled Danielle's arm toward her body and twisted her wrist, he felt the blade "slide into her back" and saw that she arched up her back, causing the knife to drop out, so he put it in his pocket.

They then got out of the car and walked toward the park. Butler could see Danielle's arm was hurt, but he did not seek medical help, since he knew he was violating the restraining order, they had just had a fight, and Danielle had a stab wound in her back. They were both stumbling and he held Danielle by the arm. When Butler noticed a neighbor was watching them, he was afraid that the noise of the fight had been heard from the car, so he decided to get away from the car. Danielle then slapped him and he pushed her to the ground. When he bent down to pick her up, she kicked him in the mouth. He kicked her about six more times, then picked her up, told her to stop because she was being unreasonable, and they went back toward the car.

Once Danielle ran away to the neighbor's house, saying that Butler was going to kill her, Butler decided he needed to "fix this," because it did not "look good." When he knocked on Lawrence's door, no one answered, so he walked back to his house. He then drove his truck to Oceanside to visit his girlfriend, where he was arrested a few days later.

In his testimony, Butler denied forcing Danielle to orally copulate him, and denied that any forcible sodomy took place, as she had agreed to all their sexual conduct. He did not intend to stab her in the back. Discussing infidelity with either his ex-wife or Danielle did not upset him.

The trial court took judicial notice of the protective order issued on July 18, 2011, prohibiting Butler from all contact with Danielle and requiring that he stay 100 yards away, and admitted the document into evidence. Butler's felony conviction of September 8, 2011 for dissuading a witness from reporting a crime was also judicially noticed and admitted into evidence. (§ 136.1, subd. (b)(1).) The document showed that Butler was out on bail, awaiting sentencing, at the time of the October 11 incidents.

The court held a series of jury instruction discussions, and Butler's counsel explained he was in a "delicate position" about the problem of proposing lesser included offense instructions, due to his concerns the jury might then enter into some kind of compromise. The prosecutor withdrew that proposed instruction. After doing some more research over the weekend, the court decided that no instructions on the lesser included offense of attempted involuntary manslaughter would be appropriate, because no evidence supported them.

Before the case was submitted to the jury, one of the juror notified the court he had received a Facebook advertisement about a criminal background check business that had a mug shot photo that looked somewhat like Butler. The court questioned all of the jurors about it, then denied Butler's request for a mistrial. Later, a new trial request on the same ground, and others, was denied.

During deliberations, the jury sent out notes requesting that several portions of the testimony be read back, but changed its request to only hear Butler's account. Ultimately, the jury convicted Butler on all four counts, but did not find true that he had used a knife during the kidnapping or sex offenses, nor did he inflict great bodily injury, except in the forcible sodomy and the attempted murder.

(Dkt. No. 13-14, Lodgment No. 7, <u>People v. Butler</u>, No. D063890, slip op. at 5-15.)

## **DISCUSSION**

### A. Standard of Review of Magistrate Judge's Report and Recommendation

The district court's role in reviewing a Magistrate Judge's report and recommendation is set forth in 28 U.S.C. § 636(b)(1). The district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); <u>see also</u> Federal Rule of Civil Procedure 72(b); <u>United States v. Remsing</u>, 874 F.2d 614, 617 (9th Cir. 1989). In the absence of a timely objection from Petitioner, the Court need "only satisfy itself that there is no clear error on the face of the record." Fed. R. Civ. P. 72(b) (advisory committee notes). When no objections are filed, a district court may assume the correctness of the magistrate judge's findings of fact and decide the motion on the applicable law. <u>Campbell v. U.S. Dist. Court</u>, 501 F.2d 196, 206 (9th Cir. 1974). Here, Petitioner has not filed an objection to the Report. The Court will therefore assume the correctness of the magistrate judge's findings of fact and decide the motion on the applicable law. <u>See</u> <u>id.</u>

### B. Legal Standard

A petition for federal habeas relief under 28 U.S.C. § 2254 can only be granted with respect to any claim that has been adjudicated on the merits in state court proceedings if the Court determines that the state court decided the petitioner's case in a manner that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d); <u>Williams v. Taylor</u> 529 U.S. 362, 403, 412-13 (2000). "Federal habeas courts making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . . [rather than] transform the inquiry into a subjective one."

Williams, 529 U.S. at 409-10. Even if Petitioner can satisfy § 2254(d), or demonstrate that it does not apply, Petitioner must still show that a federal constitutional violation occurred, and that any such constitutional error had a "substantial and injurious effect." Fry v. Pliler, 551 U.S. 112, 121-22 (2007); Arizona v. Fulminante, 499 U.S. 279, 306 (1991) (stating "most constitutional errors can be harmless.")

When the California Supreme Court summarily denies a petition for review without citation to authority, claims raised by a petitioner on appeal are analyzed under the California Court of Appeal's decision as the "last reasoned decision" on the merits of petitioner's case. Ylst v. Nunnemaker, 501 U.S. 797, 803-06 (1991); Medina v. Hornung, 386 F.3d 872, 877 (9th Cir. 2004). When a federal habeas court is faced with reviewing a state court denial for which there is no reasoned decision, the deferential standard under § 2254(d) cannot be applied because there is "nothing to which we can defer." Luna v. Cambra, 306 F.3d 954, 960 (9th Cir. 2002). "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Harrington v. Richter, 562 U.S. 86, 98 (2011). "'[W]hen the state court does not supply reasoning for its decision,' we are instructed to engage in an 'independent review of the record' and ascertain whether the state court's decision was 'objectively unreasonable.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000)); Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003) ("Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively reasonable.").

**C. Analysis**

**1. Failure of trial court to sua sponte instruct the jury (Claims 1-3)**

Petitioner claims that his federal constitutional rights were violated by the failure of the trial court to sua sponte instruct the jury on attempted voluntary manslaughter as a lesser included offense of attempted murder (Claim 1), on his reasonable but mistaken

13

belief the victim consented (Claim 2), and on the defense of accident (Claim 3). (Dkt. No. 1, Pet.)

California law provides that in criminal cases, "[T]he trial court must instruct [the jury] on the general principles of law relevant to the issues raised by the evidence," even in the absence of such instructional requests. <u>People v. Breverman</u>, 19 Cal. 4th 142, 153 (1998) (internal citations omitted). The general principles of law that must be relayed to the jury are those that are "closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." <u>Id.</u> However, a trial court's duty to instruct the jury sua sponte on theories of defense arises, "only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense *and* the defense is not inconsistent with the defendant's theory of the case." <u>Id.</u> at 157 (emphasis in original).

In the context of federal habeas petitions, a challenge to jury instructions does not generally state a federal constitutional claim. <u>Estelle v. McGuire</u>, 502 U.S. 62, 71-72 (1991) (stating "the fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief."); <u>see also</u>, <u>Marshall v. Lonberger</u>, 459 U.S. 422, 438, n. 6 (1983) ("The Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules."). In order to warrant federal habeas relief, challenges to jury instructions must establish that the jury instructions were not merely "undesirable, erroneous, or even universally condemned, but must violate some due process right guaranteed by the Fourteenth Amendment." <u>Prantil v. California</u>, 843 F.2d 314, 317 (9th Cir. 1988) (quoting <u>Cupp v. Naughten</u>, 414 U.S. 141, 146 (1973)) (internal quotations omitted). To establish a federal due process violation for failure to give jury instructions, Petitioner must demonstrate that the omission "so infected the entire trial that the resulting conviction violates due process" and not whether "the instruction is undesirable, erroneous, or even 'universally condemned.'" <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154 (1977) (citing <u>Cupp</u>, 414 U.S. at 147).

When a challenge to jury instructions is based on the refusal or failure to sua

sponte instruct the jury, the burden on the petitioner is "especially heavy" because "[a]n omission, or an incomplete instruction is less likely to be prejudicial than a misstatement of the law." See id. at 155. Furthermore, "it is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." Id. at 154; see also Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997).

Even if a petitioner meets the heavy burden of proving a trial court's failure to instruct the jury violated due process, habeas relief is not available unless the petitioner can prove such an error had a "substantial and injurious effect or influence in determining the jury's verdict," and resulted in "actual prejudice." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting United States v. Lane, 474 U.S. 438, 449 (1986)); Kotteakos v. United States, 328 U.S. 750, 776 (1946)) (internal quotations omitted); see also California v. Roy, 519 U.S. 2, 5 (1996).

### a. Claim 1—Lesser included offense of voluntary manslaughter

Petitioner contends in Claim 1 that his federal constitutional right to due process was violated by the failure of the trial court to sua sponte instruct the jury on attempted voluntary manslaughter as a lesser included offense of attempted murder. (Dkt. No. 1, Pet. at 16-21.) Petitioner alleges, "The trial record is replete with evidence that [he] acted in the heat of passion and that he harbored an actual but unreasonable belief in [the need to] defend[] himself," and the trial court therefore erred in finding there was insufficient evidence of attempted voluntary manslaughter to support the instruction. (Id. at 17.) Respondent contends that the claim does not raise a federal question, and, in the alternative, that the trial court's resolution of this claim was neither contrary to, nor an unreasonable application of clearly established Supreme Court law. (Dkt. No. 12, Answer at 22-37.)

In the Ninth Circuit, the failure to give lesser-included offense instructions in non-capital cases presents no federal question. Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000) ("[T]he failure of a state court to instruct on a lesser included offense in a non-

capital case fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding."). In contrast, California law provides that a trial court must "instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence. On the other hand, the court is not obligated to instruct on theories that have no such evidentiary support." Breverman, 19 Cal. 4th at 162. Notwithstanding Solis, Petitioner has an especially heavy burden to demonstrate the omission of the lesser included offense instructions infected the entire trial such that it violated his due process. Solis, 219 F.3d at 929; see Kibbe, 431 U.S. at 154.

Petitioner presented this claim in the petition for review that he filed with the California Supreme Court. (Dkt. No. 13-15, Lodgment No. 8 at 4-12.) The California Supreme Court denied the petition without citation to authority. (Dkt. No. 13-16, Lodgment No. 9.) Accordingly, this Court must "look through" to the opinion of the California Court of Appeal as the basis for its analysis. Ylst, 501 U.S. at 803-06.

The California Court of Appeal ruled that the trial court did not abuse its discretion by failing to instruct the jury on the lesser included offense of attempted voluntary manslaughter and affirmed the Petitioner's convictions on direct appeal. (Dkt. No. 13-14, Lodgment No. 7 at 15-23.) The appellate court, citing Breverman, 19 Cal. 4th at 162, correctly noted the trial court is required to instruct sua sponte on all theories of a lesser included offense which find substantial support in the evidence. (Id.) However, the appellate court then examined the record and found a lack of substantial support for the instruction of voluntary manslaughter. (Id.) The appellate court determined that there was not enough evidence of actual provocation by Danielle to instruct the jury on a heat of passion defense, and the record lacked substantial evidentiary support for an unreasonable self-defense theory of involuntary manslaughter. (Id. at 19, 22.) Furthermore, the appellate court noted that Butler's counsel did not object during jury instruction discussions when the prosecutor withdrew the instruction on the lesser included offenses of attempted voluntary manslaughter nor when the trial court stated it would not instruct on attempted voluntary manslaughter because there was no evidence in

support of that charge. (Id. at 20, 23.) The appellate court determined that during the trial, Butler pursued a self-defense theory of the case and no sua sponte duty to instruct the jury of the lesser included offense of attempted voluntary manslaughter arose in this respect. (Id. at 23.)

The Magistrate Judge concluded in his Report that Petitioner is not entitled to federal habeas relief based on the state court's denial of Claim 1 because no federal due process violation arose from the failure to give an instruction on attempted voluntary manslaughter. (Dkt. No. 21, Report at 18-21.) The Report agreed with the appellate court determination that the trial record lacked sufficient evidence Petitioner acted from a heat of passion because he testified that after leaving the restaurant he and the victim were "strolling, enjoying the night air, talking," and that he later kept his head and relied on his military training while trying to defend himself and disarm the knife from the victim. (Id. at 19; Dkt. No. 13-5, Lodgment No. 1, Reporter's Tr. ["RT"] at 1085, 1096-99.) The Report further noted that any instruction on the lesser included offense of voluntary manslaughter would have conflicted with Petitioner's defense theory of actual self-defense. (Dkt. No. 21, Report at 21.) It concluded that the trial court's failure to sua sponte instruct the jury on the lesser included defense of voluntary manslaughter was neither contrary to, nor an unreasonable application of, clearly established federal law as interpreted by the Supreme Court. (Id.)

This Court determines that under Solis there is no federal habeas claim for a state court failing to instruct, sua sponte, on lesser included offenses in noncapital cases such as Petitioner's. See Solis, 219 F.3d at 929. Neither the Supreme Court nor the Ninth Circuit has held that a non-capital criminal defendant has a constitutional right to a lesser included offense instruction. See Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998) ("Under the law of [the Ninth] circuit, the failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal question."); see also Keeble v. United States, 412 U.S. 205, 213 (1973) (in a direct criminal appeal by a federal defendant in a non-capital case, the Court stated "we have never explicitly held

17

that the Due Process clause of the Fifth Amendment guarantees the right of a defendant to have the jury instructed on a lesser included offense" but declined to reach the question in that case). Therefore, the state court decision cannot be said to be contrary to, or an unreasonable application of, federal law as decided by the Supreme Court. See Carey v. Musladin, 549 U.S. 70, 77 (2006) (where Supreme Court precedent gives no clear answer to question presented, "it cannot be said that the state court 'unreasonab[ly] appli[ed] clearly established Federal law.'") (citing 28 U.S.C. § 2254(d)(1)).

Additionally, Butler not only did not request an instruction on the lesser included offense, but his counsel did not object to the trial court's decision to not instruct on attempted voluntary manslaughter, noting that the lesser included offense instruction may encourage the jury to enter into some kind of compromise. (Dkt. No. 13-5, Lodgment No. 1, RT at 932.) See Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984) (stating that even assuming a failure to give a lesser included offense instructions could violate a defendant's constitutional rights, no violation occurred when defendant never requested such instructions).

Furthermore, besides not meeting his heavy burden to show a federal due process violation occurred, even if there had been a violation, Petitioner has not shown that the failure to instruct the jury on the lesser included offense had a substantial and injurious effect or influence on the jury's verdict. See Brecht, 507 U.S. at 637; Kibbe, 431 U.S. at 154. The jury found Petitioner intended to kill the victim, and there was no evidence from which the jury could have found Petitioner intentionally stabbed the victim in the heat of passion. (Dkt. No. 13-9, Lodgment No. 2, CT at 379; see also Dkt. No. 13-14, Lodgment No. 7 at 19; Dkt. No. 21, Report at 19.) Not only was there insufficient evidence to support a voluntary manslaughter defense, such defense theory would have conflicted with both the victim's and Petitioner's testimony, and the failure of the trial court to sua sponte instruct the jury on the lesser included offense of voluntary manslaughter did not substantially influence the jury verdict or cause "actual prejudice" to Petitioner. (See Dkt. No. 13-2, Lodgment No. 1, RT at 346-62 [victim's testimony that Petitioner said he was

going to kill her and stabbed her when she tried to escape]; Dkt. No. 13-5, Lodgment No. 1, RT at 1096-1101 [Petitioner's testimony that he used special training techniques to disarm victim and attempted to take control of the situation].) See also Brecht, 507 U.S. at 637; Kotteakos, 328 U.S. at 776.

For the foregoing reasons, this Court **DENIES** Claim 1 concerning the lesser included offense of voluntary manslaughter because Petitioner failed to present a colorable federal claim, has not demonstrated a federal due process violation, and even if there was a due process violation, any error was harmless. The state court's adjudication of the claim was therefore neither contrary to, nor an unreasonable application of, clearly established federal law. See 28 U.S.C. § 2254(d).

### b. Claim 2—Reasonable but mistaken belief of consent

Petitioner alleges in Claim 2 that his federal constitutional right to due process was violated by the failure of the trial court to sua sponte instruct the jury on the defense of mistaken belief in consent. (Dkt. No. 1, Pet. at 22.) He points to evidence which he argues supports a finding that he reasonably, although perhaps mistakenly, believed the victim consented to the sex acts, including (a) his testimony that the sex acts were consensual; (b) the victim recently re-initiated their relationship by sending nude photographs of herself; (c) their history of consensual sex, including earlier that day; and (d) the fact that the jury found not true the allegations that he used a knife during the sex offenses and inflicted great bodily injury during the forcible oral copulation count, despite the victim's testimony that he did, indicating that they did not believe at least some of her testimony. (Id. at 22-25.) Respondent answers that this claim does not present a federal question because the failure to instruct did not rise to the level of a federal due process violation, and, in the alternative, the state court correctly found there was insufficient evidence to support the instruction, and the denial of the claim by the state court on that basis was therefore neither contrary to, nor involved an unreasonable application of, clearly established federal law. (Dkt. No. 12, Answer at 37-42.)

As with the previous claim, Petitioner has a "heavy burden" of showing that the

failure to instruct the jury on his reasonable but mistaken belief in the victim's consent "so infected the entire trial that the resulting conviction violates due process." Kibbe, 431 U.S. at 154-55; Cupp, 414 U.S. at 147. In order for a California trial court to give sua sponte jury instructions on a defense, the instruction must be supported by substantial evidence and cannot be inconsistent with the defendant's theory of the case. Breverman, 19 Cal. 4th at 157. Substantial evidence for the purpose of jury instructions means evidence sufficient enough to deserve consideration by the jury, not whenever "*any* evidence is presented, no matter how weak." Id. at 162 (emphasis in original).

In order for a jury to be instructed on a mistaken belief of consent defense in California, the trial court must determine "whether there is substantial evidence that the defendant honestly and reasonably, but mistakenly, believed that the victim consented to sexual intercourse." Id. This requires there be substantial evidence of both a subjective belief the victim consented, as well as an objective showing that the defendant's mistake regarding the consent was reasonable under the circumstances. Id. at 360-361.

In the last reasoned state court opinion, the Court of Appeals determined that Petitioner's proposed defense of mistaken consent is unsupported by any substantial evidence in the record. (Dkt. No. 13-14, Lodgment No. 7 at 27.) The appellate court concluded that the trial court had no justification for giving a sua sponte instruction on a reasonable but mistaken belief of consent to the sexual conduct because Petitioner did not carry his burden to present substantial evidence to support that theory of defense. (Id.) The appellate court, citing People v. Williams, 4 Cal. 4th 354, 360-61 (1992), correctly explained that this defense requires substantial evidence on both the subjective and objective components of the defense. (Id. at 24-25.) The appellate court noted that even if Petitioner subjectively but mistakenly believed the victim consented based on the history of their relationship, there was insufficient evidence in the record to show that this mistaken belief of consent was objectively reasonable based on the circumstances of how they got into the car and where the conduct occurred. (Id. at 27.)

The Magistrate Judge's Report concluded that the trial court's failure to sua sponte

instruct the jury on the reasonable but mistaken belief of consent did not violate Petitioner's right to due process. (Dkt. No. 21, Report at 28.) The Report found that the adjudication of Claim 2 by the state court was objectively reasonable in finding insufficient evidence to support the objective component of the mistaken consent defense based on the manner in which Petitioner and the victim left the restaurant and arrived at the car, and in particular, the severity of the victim's injuries. (Id. at 26-27.)

Because Petitioner filed no objection to the Magistrate Judge's Report, this Court assumes the correctness of the Report's finding of fact, which agreed with the state appellate court decision, that there is insufficient evidence in the record to show Petitioner could have objectively but mistakenly believed the victim consented. (Dkt. No. 21, Report at 25.) See Campbell, 501 F.2d at 206. Furthermore, this Court is "bound to presume that state courts know and follow the law, and . . . that state-court decisions be given the benefit of the doubt." Byrd v. Lewis, 566 F.3d 855, 861-62 (9th Cir. 2009). This deference "applies with even greater force when a state court is analyzing a jury instruction developed under state law." Id. (citing Waddington v. Sarausad, 555 U.S. 179, 193-97 (2009).

Based on this Court's deference to the state court and assumption of the Report's finding of fact, this Court rejects Petitioner's allegation that the trial court's failure to sua sponte instruct the jury on the defense of mistaken belief of consent, "so infected the entire trial that the resulting conviction violates due process." Kibbe, 431 U.S. at 154. The jury was properly instructed on the prosecution's burden to prove beyond reasonable doubt the victim did not consent to the sex acts, and defense counsel for Petitioner argued that the sex acts were actually and reasonably consensual. (Dkt. No. 13-6, Lodgment No. 1, RT at 1231-32, 1311-12.) Petitioner did not argue in his defense that he misinterpreted the victim's consent to the sex acts, rather he asserted the sex acts were in fact consensual and the victim's account of the events were outright lies. (Id. at 1310-14.) In Williams, a factually similar case where the victim testified she did not consent and was violently prevented from leaving, but the defendant testified that the victim initiated and actively

pursued sexual intercourse, the California Supreme Court noted, "[W]holly divergent accounts create no middle ground from which [the defendant] could argue he reasonably misinterpreted [the victim's] conduct [and consent]." Williams, 4 Cal. 4th at 362. Likewise in the present case, although Butler may have subjectively believed the victim consented, the disparity between the victim's testimony and Butler's account of events precludes any objectively reasonable misinterpretation of consent for purposes of a mistaken consent defense. Petitioner has failed to show there was sufficient evidence in the record of a mistaken belief of consent defense, such that it triggered a sua sponte duty to instruct by the trial court.

Because there was insufficient evidence for the trial court to sua sponte instruct the jury on a reasonable but mistaken belief the victim consented to the acts, and because the instruction was not necessary for his defense, and in fact conflicted with Petitioner's testimony that the victim initiated the sex, (Dkt No. 13-5, Lodgment No. 1, RT at 1088 ["She undoes my belt. She undoes my zipper. . . . And she starts performing oral sex on me]), Petitioner fails to meet the heavy burden of showing a federal due process violation arising from the failure to give the jury instruction. See Kibbe, 431 at 155. Even if Petitioner could meet such a heavy burden, there is no evidence that the failure of the trial court to give a sua sponte instruction on the mistaken belief of consent had a "substantial and injurious effect" on the jury verdict and thus, any error is harmless. See Brecht, 507 U.S. at 637. The jury was presented with two contrasting versions of the events that took place that night, and ultimately chose to believe the victim's account. Although Petitioner argues that the jury did not entirely believe the victim's testimony that he brandished a knife during the sex acts because the jury found those allegations not true (Pet. at 25), the jury could have reasonably found she was forced to submit to the sex acts regardless of whether or not he was brandishing a knife. The jury could have also determined that those allegations had not been proven beyond a reasonable doubt, without finding that the victim testified untruthfully. Therefore, the Court finds that the failure to instruct the jury in that manner did not have a substantial and injurious effect on the jury verdict and any

error is harmless. See Brecht, 507 U.S. at 637.

For the foregoing reasons, this Court **DENIES** Claim 2 concerning the reasonable but mistaken belief of consent because Petitioner has not demonstrated a federal due process violation, and even if he did, any error would be harmless. The state court's adjudication of the claim was therefore neither contrary to, nor an unreasonable application of, clearly established federal law. See 28 U.S.C. § 2254(d).

### c. Claim 3—Defense of accident

Petitioner alleges in Claim 3 that his federal constitutional right to due process was violated by the trial court's failure to sua sponte instruct the jury on the defense of accident. (Dkt. No. 1, Pet. at 28-31.) He contends that the victim's knife wound was caused by a struggle over the knife, and that there was a factual dispute as to whether the wound was accidental or intentional. (Id.) Respondent answers that this claim is not cognizable on federal habeas grounds because it presents an issue of state law only. (Dkt. No. 12, Answer at 42-43.) Furthermore, Respondent argues that should the claim be read as presenting a federal issue, it is unexhausted because no state court has addressed the claim and is therefore procedurally defaulted. (Id.) Notwithstanding the failure to exhaust the claim, Respondent argues that the claim should be denied because there is insufficient evidence to support the instruction and any federal error is harmless. (Id. at 43-45.) Petitioner later agreed that the claim is unexhausted and procedurally defaulted and sought to withdraw the claim from his Petition. (Dkt. No. 20, Traverse at 2, 22.)

Claim 3 was presented to the California Supreme Court in August 2014, in the petition for review. (Dkt. No. 13-15, Lodgment No. 8 at 22-25.) In that petition, Petitioner's appointed appellate counsel argued as to Claim 3: "Because of the Court of Appeal's failure to address this contention, and in light of other issues passed over by the court, appellant requests remand and rehearing so the Court of Appeal can address all of his contentions and grant the requested relief." (Id. at 26.) That same counsel presented Petitioner's Claim 3 to the appellate court on October 15, 2013, in the opening brief on direct appeal. (Dkt. No. 13-10, Lodgment No. 3 at 40-44.) However, on November 1,

2013, prior to the People filing a responsive brief, counsel sent a letter to the appellate court stating: "It has been brought to my attention that the argument raised in Claim III of the appellant's opening brief has been resolved by the California Supreme Court and there is no longer a *sua sponte* duty for the court to instruct on the defense of accident. Please strike that argument at pages 40 to 44 of the brief. I apologize for the error and any inconvenience to the court." (Dkt. No. 13-11, Lodgment No. 4 at 1.) Petitioner's appellate counsel was presumably referring to People v. Anderson, which holds, "[A] trial court need not instruct on the defense of accident on its own initiative, so long as the jury received complete and accurate instructions on the requisite mental element of the charged offense." Anderson, 51 Cal. 4th 989, 1001 (2011). It is not clear from the record why counsel raised the claim in the state supreme court after withdrawing the claim from the appellate court.

In order to exhaust state judicial remedies for purposes of federal habeas relief under 28 U.S.C. § 2254, a state prisoner must present the state's highest court with a fair opportunity to rule on the merits of every issue raised in their federal habeas petition. Granberry v. Greer, 481 U.S. 129, 133-34 (1987); Duncan v. Henry, 513 U.S. 364, 365-66 (1995). A claim is considered fairly presented to a state court if done so in a manner which allows that court to have "the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding." Picard v. Connor, 404 U.S. 270, 275-76 (1971). However, a claim fails to be fairly presented to a state court if it is presented in a manner that precludes consideration by the state court. Castille v. Peoples, 489 U.S. 346, 351 (1989). Furthermore, federal courts have discretion to deny a habeas application on the merits notwithstanding a petitioner's failure to exhaust state remedies. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.")

Although Petitioner's appointed appellate counsel withdrew the claim from the appellate court brief (Dkt. No. 13-11, Lodgment No. 4), counsel included it in the

California Supreme Court petition for review. (Dkt. No. 13-15, Lodgment No. 8 at 22-25.) The California Supreme Court summarily denied the petition on all claims without citation to authority. (Dkt. No. 13-16, Lodgment No. 9.) The silent denial of a claim by a state supreme court is presumed to be an adjudication on the merits of the claim. See Richter, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.") Because Claim 3 was included in the California Supreme Court petition for review, and that court's denial of the petition is presumed to be adjudicated on the merits, Claim 3 was fairly presented for consideration by a state court and the exhaustion requirement for federal habeas relief under 28 U.S.C. § 2254(d) is therefore satisfied. Accordingly, this Court rejects Respondent's contention that the claim is unexhausted and procedurally defaulted. Furthermore, this Court rejects Petitioner's request to withdraw the claim from his Petition, as his request is seemingly based on the unsupported and erroneous representation in Respondent's Answer that the claim is unexhausted. See Zichko v. Idaho, 247 F.3d 1015, 1020 (9th Cir. 2001) (federal courts are required to liberally construe pro se prisoner habeas petitions, especially with regard to the determination as to which claims are presented).

Because the claim was presented only in the petition for writ of habeas corpus to the California Supreme Court, and the state supreme court did not articulate the reasons for denying the claim, this Court must conduct an independent review of the record to determine whether the denial is contrary to, or an unreasonable application of, clearly established Supreme Court law. See Richter, 562 U.S. at 99, 102 ("[The Court] must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]"); Himes, 336 F.3d at 853. As with Petitioner's other claims regarding sua sponte jury instructions, Petitioner has a "heavy burden" of showing that the failure

25

to instruct the jury on the defense of accident "so infected the entire trial that the resulting conviction violates due process." <u>Kibbe</u>, 431 U.S. at 154-55; <u>Cupp</u>, 414 U.S. at 147.

The Magistrate Judge's Report concluded that Petitioner demonstrated no federal due process violation and the trial court's failure to sua sponte instruct the jury on the defense of accident was objectively reasonable. (Dkt. No. 21, Report at 32.) The jury was instructed that in order to convict Petitioner of attempted murder the prosecution was required to prove beyond a reasonable doubt that he had "the intent to kill another person." (Dkt. No. 13-6, Lodgment No. 1, RT at 1224.) By convicting Petitioner of attempted murder, the jury rejected Petitioner's testimony that the victim was stabbed inadvertently, and instead determined he had the requisite intent to kill the victim. The Report determined that the state court reasonably found it unnecessary to further instruct the jury that Petitioner could not be convicted of attempted murder if the stabbing was an accident. (Dkt. No. 21, Report at 31.)

Because the jury was properly instructed on the requisite mental state necessary for an attempted murder conviction, and Petitioner failed to request an instruction on the defense of accident, Petitioner did not meet the heavy burden of demonstrating how the failure of the trial court to instruct the jury sua sponte on the defense of accident "infected the entire trial" that it resulted in a federal due process violation. <u>See</u> <u>Kibbe</u>, 431 U.S. at 153-55. Even assuming Petitioner could demonstrate a federal due process violation from the failure to give the instruction, any error is clearly harmless because it could not have had a substantial or injurious effect or influence on the jury's verdict. <u>See</u> <u>Brecht</u>, 507 U.S. at 637. During the trial, the jury was instructed that the prosecution had the burden to prove Petitioner intended to kill the victim when he stabbed her. (Dkt. No. 13-6, Lodgment No. 1, RT at 1217-18.) The victim testified that Petitioner explicitly told her multiple times he was going to kill her (Dkt. No. 13-2, Lodgment No. 1, RT at 359-60), whereas Petitioner testified that the stabbing was inadvertent and accidental. (Dkt. No. 13-5, Lodgment No. 1, RT at 1098-1122.) Because the jury was properly instructed on the prosecutor's burden of proof, and the jury had the choice whether to believe the

victim's story of an intentional stabbing or Petitioner's story of an accidental stabbing, it is clear the trial court's failure to further instruct the jury on the defense of accident did not have a substantial or injurious effect on the jury's verdict. See Brecht, 507 U.S. at 637.

For the foregoing reasons, this Court finds that Claim 3 of the petition is exhausted and not procedurally defaulted, rejects Petitioner's request to withdraw the claim, and **DENIES** this claim on the merits because Petitioner has not demonstrated a federal due process violation and even if he did, any error is harmless. The adjudication of this claim by the state court was neither contrary to, nor an unreasonable application of, clearly established federal law. See 28 U.S.C. § 2254(d).

### 2. Failure to conduct an adequate investigation into potential juror misconduct (Claim 4)

Petitioner alleges in Claim 4 that the trial court abused its discretion and failed to conduct an adequate investigation into potential juror misconduct. (Dkt. No. 1, Pet. at 32-38.) Petitioner asserts that after a juror informed the trial judge he had received a Facebook post with what appeared to be Petitioner's photograph and a reference to the availability of a criminal background check, the trial court failed to contact the companies involved or ask the juror if he had conducted an internet search about Petitioner which may have generated the Facebook post. (Id.) Respondent asserts that the trial court conducted an adequate and reasonable investigation when it questioned every juror and discovered no evidence of improper communication, and contends that any suggestion of juror misconduct is purely speculative. (Dkt. No. 12, Answer at 45-49.) Respondent further argues that the state court's denial of the claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law. (Id.)

Petitioner has a Sixth Amendment right to a trial by jury and a verdict which "must be based upon the evidence developed at the trial." Turner v. Louisiana, 379 U.S. 466, 472-73 (1965). This right is implicated if a jury is "exposed to prejudicial extrinsic information . . . during jury deliberation." Mancuso v. Olivarez, 292 F.3d 939, 949 (9th

27

Cir. 2002). When extrinsic evidence is introduced in the jury room, a defendant is entitled to a new trial "if there existed a reasonable possibility that the extrinsic material could have affected the verdict." United States v. Vasquez, 597 F.2d 192, 193 (9th Cir. 1979); Gibson v. Clanon, 633 F.2d 851, 855 (9th Cir. 1980). However, federal courts must defer to a trial judge's determination of juror partiality or bias with respect to federal habeas petitions. Miller v. Fenton, 474 U.S. 104, 114 (1985) (noting that a state trial judge is in a far superior position to assess juror bias than federal habeas judges); see also Austad v. Risley, 761 F.2d 1348, 1350 (9th Cir. 1985) ("The Supreme Court has clearly established that the determination of a juror's partiality or bias is a factual determination to which section 2254(d)'s presumption of correctness applies.") (citing Pattor v. Yount, 467 U.S. 1025, 1036 (1984)). In California, when trial courts become aware of possible jury misconduct, the courts "must make whatever inquiry is reasonably necessary to resolve the matter . . . [and] have considerable discretion in determining how to conduct the investigation." People v. Virgil, 51 Cal. 4th 1210, 1284 (2011) (internal citations omitted).

The last reasoned state court opinion from the Court of Appeal concluded there was nothing in the record to suggest that extrinsic evidence was presented to the jury, and the trial court judge had an adequate basis to conclude the purported misconduct did not require further investigation. (Dkt. No. 13-14, Lodgment No. 7 at 31.) The appellate court reasoned that the trial court did not abuse its investigatory discretion because the juror who received the post stated he could set aside consideration of the post and base his decision on the evidence presented in the courtroom, the other jurors were questioned on their communication with one another and determined to have not sent the post, and all of the jurors were instructed on their duty not to use the Internet in any way in connection with the case and made aware of their responsibility to decide the case based only on evidence presented at trial. (Id. at 28-31.)

The Magistrate Judge's Report similarly concluded that the trial court's investigation into the origins of the Facebook post was objectively reasonable and did not

violate Petitioner's due process rights. (Dkt. No. 21, Report at 35-37.) The Report points out the speculative nature of the claim, noting that nothing in the record suggests extrinsic evidence was presented to the jury, much less that the verdict was affected. (Id. at 35.)

As the Report correctly identifies, this Court must defer to the trial court's determination that the only juror who was exposed to the Facebook post was able to remain impartial. (Id. at 36.) See Miller, 474 U.S. at 114; Austad, 761 F.2d at 1350. Here, Petitioner has not demonstrated that extrinsic evidence was introduced into jury deliberations, or that the trial court's investigation into the potential juror misconduct was inadequate. The trial judge's investigation and determination of the matter was not contrary to or an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d).

Furthermore, the jury was already presented evidence during trial about the Petitioner's former arrests. (Dkt. No. 13-3, Lodgment No. 1, RT at 610-15 [altercation with former wife], RT at 614-18 [violation of restraining order protecting former wife]; Dkt. No. 13-4, Lodgment No. 1, RT at 885-89 [conviction for attempting to dissuade witness]; Dkt. No. 13-5, Lodgment No. 1, RT 1026-27 [violation of restraining order protecting victim in present case].) Any mere suggestion of a potential criminal background from a Facebook post would have been duplicative of information the jury was already aware of. Accordingly, it is clear that even if there had been error, any alleged error would have had no impact on the jury's verdict. See Brecht, 507 U.S. at 637.

For the foregoing reasons, the Court **DENIES** Petitioner's Claim 4 alleging an inadequate investigation of potential juror misconduct, finding that Petitioner has not demonstrated any federal due process violation arising from the alleged error, the trial court's inquiry into the matter was both reasonable and proper, and thus the state court's adjudication of the claim was neither contrary to, nor an unreasonable application of, clearly established federal law. See 28 U.S.C. § 2254(d).

### 3. Petitioner deprived of effective assistance of counsel (Claim 5)

Petitioner alleges in his final claim that he was deprived of his federal constitutional right to the effective assistance of counsel because his trial counsel failed to object to multiple instances of misconduct during the prosecutor's closing argument. (Dkt. No. 1, Pet. at 39-43.) Specifically, Petitioner contends the prosecutor: (a) improperly commented on Petitioner's right to be present at the trial and testify; (b) attacked the defense counsel's integrity; (c) expressed a personal opinion of Petitioner's guilt; (d) vouched for witnesses; and (e) made a "Golden Rule argument coupled with a law and order appeal." (Id.) Respondent answers that the denial of this claim by the state court is reasonable because the prosecutor made no objectionable comments and therefore the failure of defense counsel to object did not constitute ineffective assistance. (Dkt. No. 12, Answer at 50-60.)

To establish that counsel's performance was ineffective, Petitioner must show that (1) his "counsel's representation fell below an objective standard of reasonableness" and (2) that such failure prejudiced him in that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). When considering a claim of ineffective assistance of counsel, a reviewing court must be highly deferential to counsel's performance. Id. at 689. "Counsel's competence, however, is presumed and the defendant must rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." Kimmelman v. Morrison, 477 U.S. 365, 384 (1986). This necessitates a case-by-case examination of the evidence. See Williams v. Taylor, 529 U.S. 362, 391 (2000). Furthermore, when reviewing state prisoner habeas claims based on the ineffective assistance of counsel, federal courts are required to use a "doubly deferential standard of review that gives both the state court and the defense attorney the benefit of the doubt." Burt v. Titlow, 134 S. Ct. 10, 13 (2013) (quoting Cullen v. Pinholster, 563 U.S. 170, 171-72 (2011)).

Specifically, in the case of federal habeas review of prosecutorial misconduct, "The relevant question is whether the prosecutor['s] comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (citing Donnelly v. DeChristoforo, 416 U.S. 637 (1974)). For purposes of granting federal habeas relief, any prosecutorial trial error must be more than merely undesirable or erroneous, it must rise to the level of a constitutional denial of due process, and be reviewed in the context of the entire trial. Donnelly, 416 U.S. at 643; see Cupp, 414 U.S. at 146.

The last reasoned decision from the California Court of Appeal denied Petitioner's claim on the ineffective assistance of counsel. (Dkt. No. 13-20, Lodgment No. 13.) The appellate court first noted that Petitioner's claim could be denied on the basis that it was untimely and that the trial transcripts were not attached. (Id.) However, the appellate court goes on to conclude, "Butler's claim also fails on the merits. None of the various remarks by the prosecutor during closing arguments . . . amounted to misconduct . . . and any objection by Butler's trial counsel properly would have been overruled." (Id.) The appellate court determined that the failure of Butler's counsel to make meritless objections could not be the basis for his ineffective assistance of counsel claim. (Id.) Although Petitioner later attached the trial transcript in his subsequent petition to the California Supreme Court and that court denied the claim without citation of authority, it is presumed that the state supreme court adopted the reasoning of the appellate court with respect to the denial of the claim on the merits, rather than on the procedural defect or the option to deny the claim on the basis of untimeliness. Ylst, 423 U.S. at 805 (when deciding the basis of an unexplained denial of a petition for habeas corpus by a state court "we begin by asking which is the last *explained* state-court judgment on the … claim") (emphasis in original); see also Barker v. Fleming 423 F.3d 1085, 1091-92 (9th Cir. 2005) (finding that the last reasoned decision for purposes of a federal habeas review was the court order "that explained in detail why review was denied and specifically examined the substance of [the] claim."); Lambert v. Blodgett, 393 F.3d 943, 969 (9th

Cir. 2004) ("[A] state has 'adjudicated' a petitioner's constitutional claim 'on the merits' for purposes of § 2254(d) when it has decided the petitioner's right to post conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review of the merits.").

The Magistrate Judge's Report found that the comments made by the prosecutor during closing arguments were proper and did not rise to the level of prosecutorial misconduct, and Petitioner failed to demonstrate he was prejudiced by his counsel's failure to object to these comments "because they did not violate due process, and because an objection, had it been made and sustained, would have resulted in a curative instruction identical to those already given, namely, informing the jury that the argument of counsel is not evidence but merely an expression of their opinion as to what the evidence shows." (Dkt. No. 21, Report at 45). The Report emphasized that the trial judge reminded the jurors before closing arguments that attorneys' comments did not constitute evidence and were presented merely to "outline for you his or her interpretation as to what the evidence has shown." (Dkt. No. 21, Report at 42; see Dkt No. 13-6, Lodgment No. 1, RT at 1243.) Given these instructions and the permissibility of the prosecutor's statements during closing arguments, the Report concludes that it was objectively reasonable for the state court to find defense counsel was not ineffective for failing to object. (Dkt. No. 21, Report at 43.)

As explained below, this Court similarly concludes that the statements made by the prosecutor during closing arguments did not constitute prosecutorial misconduct and any failure to object by Petitioner's counsel did not rise to the level of a federal due process violation for ineffective assistance of counsel.

First, Petitioner alleges that the prosecutor improperly commented on his right to be present at trial when she noted his ability to tailor his testimony and explain away his guilt during closing arguments. (Dkt. No. 1, Pet. at 39.) Despite Petitioner's contention that this statement rises to the level of prosecutorial misconduct, the Supreme Court has

held a prosecutor's statement that "the defendant has [the] benefit [of] get[ting] to sit here and listen to the testimony of all the other witnesses before he testifies" does not violate a habeas petitioner's constitutional right to be present at trial. <u>Portuondo v. Agard</u>, 529 U.S. 61, 64-65 (2000). The statement made by the prosecutor in Petitioner's case is very similar to that in the <u>Portuondo</u> case. (Dkt. No. 13-6, Lodgment No. 1, RT at 1245, "[Petitioner] got to sit here and listen to all the evidence against him before he ever raised his hand and took an oath to tell the truth.") Accordingly, Petitioner fails to show how the prosecutor's statement on his ability to tailor his testimony is contrary to clearly established federal law under <u>Portuondo</u>, 529 U.S. at 64-65.

Next, Petitioner contends that the prosecutor improperly attacked the integrity of his defense counsel in her rebuttal to closing arguments when she stated defense counsel "glossed over the law" and "glossed over his client's testimony." (Dkt. No. 1, Pet. at 39.) The prosecutor continued before the jury, "When you sit here and you are given two different versions of evidence, two different versions of truth of what happened, and the defense attorney stands up and glosses over his own client's testimony, you as a jury are called upon to use your common sense and to wonder how much sense that makes to you. How much sense does it make . . . not to pick apart what his client said, but to gloss over it, to gloss over the law, and then spend the bulk of the argument going into every little detailed statement Danielle made[?]" (<u>Id.</u>) The Ninth Circuit has held a prosecutor is "free to voice doubt about the veracity of a defendant's story [when] the inference that one side is lying is unavoidable" and there is evidence to support such attack. <u>Dubria v. Smith</u>, 224 F.3d 995, 1004 (9th Cir. 2000); <u>see also</u> <u>United States v. Sayetsitty</u>, 107 F.3d 1405, 1409 (9th Cir. 1997) ("Criticism of defense theories and tactics is a proper subject of closing arguments.") Here, the prosecutor's statement that defense counsel "glossed over the law" (Dkt. No. 13-6, Lodgment No. 1, RT at 1324) was an attempt to urge the jury to select from two different versions of the truth and is a proper closing argument attack on the defense theory of the case. Such a statement does not rise to the level of prosecutorial misconduct under clearly established federal law. <u>See</u> <u>Smith</u>, 224 F.3d at

1004; <u>Sayetsitty</u>, 107 F.3d at 1409.

Additionally, Petitioner alleges the prosecutor improperly expressed her personal opinion of Petitioner's guilt and improperly vouched for the credibility of the witnesses. (Dkt. No. 1, Pet. at 40-42.) Specifically, Petitioner has issue with the prosecutor's expression of her personal opinion through her comments: "Now, he selected Danielle for specifically one reason: He thought he could get away with what he did." (Dkt. No. 13-6, Lodgment No. 1, RT at 1248); "I think his right to have a relationship with Danielle D. ended when he forcefully sodomized her in the back of the car, when he ripped her anus open to the point where she was oozing blood, when he stuck a knife in her back when she was crying in terror, running into the arms of a complete stranger, begging for help." (<u>Id.</u> at 1249); "And when I take you through the evidence in this case, I suggest to you that the defense's theory is completely unreasonable." (<u>Id.</u> at 1255); "He did not act in self-defense in this case, His actions are not reasonable in any way." (<u>Id.</u> at 1354); and "I know it's been a long day, but it is important in this case to talk about the reasonableness of the defendant's version and the unreasonableness." (<u>Id.</u> at 1355.) Petitioner further objects to comments made by the prosecutor that the victim "was honest with you about her shortcomings. She is not a liar. She was honest about the fact that she had had consensual vaginal sex with him that morning. She never hid that fact from anyone. She never told anyone that didn't happen. She didn't have to volunteer that information. If she was trying to make herself look better, she absolutely didn't need to be forthcoming about that information, but she was, because she was telling the truth," that Petitioner's ex-wife's testimony was "totally credible," that Petitioner's account of events was "not what happened," and Petitioner "thought he could get away with it." (<u>Id.</u> at 1248, 1251, 1327, 1329.) Although vouching for a witness is improper when a prosecutor expresses her personal opinion of the defendant's guilt, <u>United States v. Younger</u>, 398 F.3d 1179, 1190 (9th Cir. 2005), or places the prestige of the government behind a witness's credibility, <u>United States v. Molina</u>, 934 F.2d 1440, 1444 (9th Cir. 1991), the Supreme Court has concluded that improper vouching does not occur when the comments are

34

invited by a defense counsel's attack on credibility, and when a prosecutor does not say or insinuate that the statement was based on anything other than witness testimony. <u>Lawn v. United States</u>, 355 U.S. 339, 359 n.15 (1958). Petitioner has made no showing that the prosecutor relied on anything other than witness testimony and facts stated therein. Furthermore, the prosecutor's remarks fit within the reasonable latitude prosecutors have to argue one of the two sides is lying. <u>Molina</u>, 934 F.2d at 1444 (stating it is reasonable to argue one of two sides is lying during closing arguments in a case that essentially reduces to which of two conflicting stories is true). The Supreme Court has also held that when jury instructions are given that clarify that attorney comments are not evidence, as the jury was instructed immediately before closing arguments in Petitioner's trial, including that the attorney's comments were presented to "outline for you his or her interpretation as to what the evidence has shown", (Dkt. No. 13-6, Lodgment No. 1, RT at 1243), any possible prejudice from prosecutorial statements on the weight of evidence is properly mitigated. <u>Darden</u>, 477 U.S. at 182 (finding no due process violation where the weight of the evidence was against the petitioner, the prosecutor's remarks were invited by defense argument and did not misstate or manipulate the evidence, and were cured by the instructions). Petitioner has failed to show how the prosecutor's statements regarding his guilt and the credibility of the witnesses violate clearly established federal law. <u>See</u> <u>Lawn</u>, 355 U.S. at 359 n.15.

Lastly, Petitioner contends the prosecutor improperly invoked the golden rule and appealed to law and order when she told the jury they "had the power to end the nightmare" for the victim. (Dkt. No. 1, Pet. at 42.) This statement, viewed in the context of the entire trial, was a comment on the strength of the evidence against Petitioner and the severity of the crime, not appealing for revenge. The prosecutor continued, "And for one year she has waited, ladies and gentlemen. In this case he's guilty of each and every charge and allegation. He is used to being in power and control. And the power and control is in your hands collectively, together, as jurors. You can take your time if you need to, but in this case you need to do justice because it is the right thing, and the only

consistent and inescapable truth in this case is that he is guilty of each and every one of these crimes." (Dkt. No. 13-6, Lodgment No. 1, RT at 1363-64.) Here, the prosecutor did not misstate or manipulate the evidence, the jury was instructed that attorney comments were not evidence but only opinions, and requesting the jury return a guilty verdict is the goal of a prosecutor whose role it is to vindicate the public's interest in punishing crime. See Darden, 477 U.S. at 181-82; Drayden v. White, 232 F.3d 704, 712-713 (9th Cir. 2000). Nevertheless, even if the comments went further than asking the jury to vindicate the public's interest in punishing the crime, in light of the strength of the evidence against Petitioner, including his past history of similar domestic violence, it is clear the comments did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." Darden, 477 U.S. at 182 (finding no due process violation where the weight of the evidence was against the petitioner, the prosecutor's remarks were invited by defense argument and did not misstate or manipulate the evidence, and were cured by the instructions).

In sum, federal law precedence makes it clear that the statements made by the prosecutor during closing arguments, which Petitioner alleges constitute prosecutorial misconduct, were proper and his counsel's failure to object to these statements did not rise to the level of a due process violation. Furthermore, Petitioner has not shown that defense counsel's failure to object to the prosecutor's statements was not a legitimate trial strategy intended to avoid drawing attention and scrutiny to the weaknesses of Petitioner's case. See Kimmelman, 477 U.S. at 384. Given the permissibility of the prosecutor's statements made during closing arguments, the potential that defense counsel intentionally withheld any objections to avoid exposing the weaknesses of the case, and the fact the jury was instructed prior to closing arguments that what the attorneys say is not evidence, Petitioner fails to show how the state court adjudication of Claim 5 was contrary to or an unreasonable application of clearly established federal law. His counsel's representation did not fall below an objective standard of reasonableness and there is no evidence such objections would have resulted in a different outcome. See

Strickland 466 U.S. at 688.

After examining the statements made by the prosecutor and conduct of counsel in context of the entire trial, and under the "doubly deferential" standard of review giving the state court and defense attorney the benefit of the doubt, this Court finds no federal due process violation. See Titlow, 134 S. Ct. at 13. For the foregoing reasons, the Court **DENIES** habeas relief for Petitioner's Claim 5 alleging ineffective assistance of counsel for failing to object to prosecutor's comments, finding that Petitioner has not demonstrated any federal due process violation arising from the alleged error, and the state court's adjudication of the claim is neither contrary to, nor an unreasonable application of, clearly established federal law. See 28 U.S.C. § 2254(d).

## CERTIFICATE OF APPEALABILITY

A petitioner complaining of detention arising from state court proceedings must obtain a certificate of appealability to file an appeal of the final order in a federal habeas proceeding. 28 U.S.C. § 2253(c)(1)(A). The district court may issue a certificate of appealability if the petitioner "has made a substantial showing of the denial of a constitutional right." Id. at (c)(2). To make a "substantial showing," the petitioner must "demonstrat[e] that reasonable jurists would find the district court's assessment of the constitutional claims debatable." Beaty v. Stewart, 303 F.3d 975, 984 (9th Cir. 2002) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)). Petitioner has not made a "substantial showing" as to any of the claims raised by his Petition, and thus the Court **DENIES** a certificate of appealability.

////
////
////
////
////
////

## <u>CONCLUSION</u>

For all of the foregoing reasons, this Court: (1) **ADOPTS** the Magistrate Judge's Report in its entirety denying the petition for writ of habeas corpus, and (2) **DENIES** a certificate of appealability.

IT IS SO ORDERED.

Dated:  April 12, 2017

Hon. Gonzalo P. Curiel
United States District Judge